1

2

3

4

5

6

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

AMTAX HOLDINGS 260, LLC, an Ohio
limited liability company, AMTAX
HOLDINGS 114, LLC, an Ohio limited
liability company, and ALDEN TORCH
FINANCIAL LLC, a Delaware limited
liability company,

Civil Action No.

**COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF**

13

            Plaintiffs,

14

        v.

15

16

17

18

19

20

21

WASHINGTON STATE HOUSING
FINANCE COMMISSION, a public body
Corporate and politic of the State of
Washington, BILL RUMPF, an individual,
LISA J. BROWN, an individual, DIANE
KLONTZ, an individual, DUANE
DAVIDSON, an individual, JASON
RICHTER, an individual, RICH
NAFZIGER, an individual, ALBERT TRIPP,
an individual, RANDY ROBINSON, an
individual, ALISHIA TOPPER, an
individual, LOWEL KRUEGER, an
individual, KEN A. LARSEN, an individual,
and WENDY L. LAWRENCE, an individual,

22

            Defendants.

23

24

25

26

COMPLAINT - 1
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# INTRODUCTION

1.      This suit involves a state agency acting outside of the scope of its delegated authority by adopting regulations on behalf of local special interests that are both patently unfair and constitutionally defective on a number of levels.

2.      Congress created the federal low-income housing tax credit ("LIHTC") as part of the Tax Reform Act of 1986.  The LIHTC program encourages private investment in affordable housing by providing federal tax credits to owners of affordable housing projects that comply with certain rent restrictions and other requirements set forth in Section 42 of the Internal Revenue Code, 26 U.S.C. § 42 ("Section 42").  Section 42, in turn, follows the "economic substance" doctrine—a bedrock principle of federal tax law—pursuant to which a party is deemed a bona fide owner (and thus eligible to claim tax credits) only if it has a reason to participate in the arrangement *apart from* any tax benefits.  For example, in order to be deemed a true owner eligible to claim LIHTC tax credits, an investor must have *upside potential* (*e.g.*, the right to benefit from appreciation of the property) and *downside risk* in the project in addition to any tax benefits it may claim.

3.      The LIHTC program is the most important resource for creating affordable housing in the United States today, with more than three million affordable LIHTC units placed in service between 1987 and 2017.  All of these units were built with capital from private investors, whose participation in the LIHTC program is critical to its success.

4.      LIHTC projects are typically structured as a limited partnership between an investor limited partner and a general partner (or "sponsor") that is usually a for-profit developer or qualified nonprofit organization focused on affordable housing.  The investor limited partner provides the necessary capital in exchange for an ownership stake—and thus receives tax credits proportionate to its ownership percentage—while the general partner is responsible for developing and operating the project.  LIHTC investors earn tax credits over a fifteen-year period that is referred to in the industry as the "compliance period."

COMPLAINT - 1
No.

5.      In 1989, Congress added a provision to Section 42, 26 U.S.C. § 42(i)(7) ("Section 42(i)(7)") that authorized LIHTC partnership agreements to permit tenants—and, following its expansion in 1990, nonprofit general partners—to hold a *right of first refusal* ("ROFR") that would allow the holder to buy the property after the compliance period at a statutory, below-market price provided that certain conditions were met, including that the investor-owners had received a bona fide third party offer to buy the property and had consented to a sale on those terms.

6.      The inclusion of a ROFR in Section 42(i)(7) was an intentional and deliberate legislative compromise that followed extensive debate in Congress.  While some had urged Congress to permit a self-triggering and unilateral below-market purchase option, others argued against *any* below-market transfer right to ensure compliance with the economic substance doctrine.  Congress ultimately authorized a ROFR as a compromise solution.  Section 42(i)(7) thus provides that an eligible nonprofit may acquire a LIHTC property at the below-market statutory price only if the well-established conditions for exercising a ROFR are met.  As noted above, these conditions include the receipt of a bona fide third-party offer and the consent of the investor-owners to sell the property.

7.      The text and legislative history of Section 42(i)(7) are thus clear that the authorization of a below-market ROFR was a reasoned and deliberate policy choice by Congress. Recently, however, certain nonprofit general partners have sought to deprive investor-owners of the appreciated value of their LIHTC investments and disregard Congress' explicit policy choice by attempting to exercise their below-market ROFR as though they were self-triggering below-market purchase options.

8.      In particular, a LIHTC general partner in Washington called Senior Housing Assistance Group ("SHAG") asserted a unilateral right to buy out its investors in seven LIHTC properties at a below-market price after the compliance period and sued its limited partners when they refused to sell on those terms.  In March 2019, this Court squarely rejected SHAG's claims,

1   correctly holding consistent with the text and history of Section 42(i)(7) that the LIHTC

2   partnership agreements include only a *right of first refusal*—a common-law term of art with

3   strict limits on its exercise—rather than a unilateral purchase option.  *See Senior Housing*

4   *Assistance Group v. AMTAX Holdings 260, LLC, et al.*, No. C17-1115-RSM, 2019 WL 1417299

5   (W.D. Wash. Mar. 29, 2019) ("*SHAG*").

6        9.    Dissatisfied with this Court's resolution of the *SHAG* case, SHAG and their allies

7   turned to the Washington State Housing Finance Commission (the "WSHFC" or "Commission")

8   in an attempt to compel through regulation what they could not achieve in court.  State housing

9   finance commissions such as the WSHFC have limited authority under the federal LIHTC

10   program to allocate tax credits prospectively to specific projects, and to monitor individual

11   LIHTC projects to ensure compliance with program requirements (*e.g.*, health and safety

12   standards, rent restrictions, and tenant qualifications).  But state commissions have zero authority

13   to *interpret* LIHTC partnership agreements (which are governed by Section 42 and ordinary

14   principles of contract law) or to retroactively reallocate contractual rights between investor-

15   owners and project sponsors.

16        10.   Nonetheless, in August 2019, the WSHFC adopted a new rule (the "Litigation

17   Penalty") that seeks to reallocate and abrogate investors' rights under LIHTC partnership

18   agreements.  Under the new rule—which was adopted through a rushed, secretive, and highly

19   irregular process—the Commission will not consent to any investment in a LIHTC project in

20   Washington if the investor has previously "engaged in litigation concerning a sponsor's

21   ownership interest" at the conclusion of the compliance period.  *See* WSHFC, *Tax Credit*

22   *Compliance Procedures Manual*, Ch. 9 Property Transfers (Dec. 2019) at 3-4, *available at*

23   http://www.wshfc.org/managers/ManualTaxCredit/110_Chap09PropertyTransfers.pdf.

24        11.   The Litigation Penalty thus permanently and categorically bars investors from

25   obtaining an ownership interest in any new or existing projects in Washington if it has engaged

26   in *any* litigation over ownership with a LIHTC general partner—regardless of whether the

COMPLAINT - 3
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

investor was the plaintiff or defendant, and regardless of whether the investor ultimately *prevailed* in the litigation. Indeed, the Litigation Penalty essentially blacklists investors from participating in future projects in Washington even if they *successfully* defend themselves in court against frivolous claims brought by a general partner (including, in particular, improper attempts to self-trigger a below-market ROFR). And the Litigation Penalty also impairs investor-owners' ability to enforce their contract and property rights in *existing* LIHTC projects, as the threat of sanctions for any litigation will pressure investors to yield to general partners' demands whenever disputes over ownership arise. The clear purpose and effect of the Litigation Penalty is to punish investor-owners that attempt to assert or defend their ownership rights in court, and to ensure that investors are forced to sell their interests at below-market terms dictated by general partners.

12.     In addition to the Litigation Penalty, the Commission also took other steps in an attempt to bend the law in favor of politically connected general partners and against investor-owners. Most notably, in September 2019, the Commission published a "Report" on LIHTC project ownership disputes that sets forth what it calls a "clear interpretive framework" for resolving such disputes. *See* WSHFC, *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing* (Sept. 2019), *available at* https://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf. This Report—which originated as an *amicus* brief prepared in the connection with an appeal of the *SHAG* litigation that SHAG later dismissed—is presented as a mere summary of the law but in fact sets forth a highly biased and skewed interpretation of the LIHTC program's statutory text, history, and purpose. At bottom, the Report argues that general partners should prevail over investors whenever disputes arise over project ownership, to advance what the Commission calls the "purposes" of the LIHTC program. The Report argues that nonprofit LIHTC general partners are always entitled to buy out investor-owners at a below-market price at the end of the compliance period, and that courts should interpret LIHTC partnership agreements to guarantee

COMPLAINT - 4
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

that result.  The Commission's Report is not only *ultra vires*, but also flatly contradicted by the plain language and legislative history of Section 42, and would undermine the bedrock tax and ownership principles on which the entire LIHTC program is based.

13.     Contrary to the claims of LIHTC general partners and their allies, including the WSHFC, these efforts to ignore the plain language and legislative history of Section 42 and reverse the outcome of the *SHAG* litigation have nothing to do with the preservation of affordable housing.  Instead, they reflect a naked attempt to unilaterally and retroactively rewrite unambiguous contracts, and to transfer to nonprofit general partners the exclusive right to benefit from the substantial appreciation in value of affordable housing properties owned by LIHTC investors.  As explained below, the WSHFC's efforts, if successful, would upend legitimate investment and contract-backed expectations, and would undermine and frustrate the purpose of Section 42, which is to *encourage* private investment in affordable housing.

14.     The WSHFC's Report leaves no doubt that the Commission is trying to rewrite both Section 42 and existing partnership agreements in order to transfer ownership from investor-owners to nonprofit general partners.  And the Litigation Penalty attempts to achieve the Commission's objective by punishing investors who seek to prevent nonprofit general partners from exercising their Section 42(i)(7) ROFR unilaterally.

15.     The Litigation Penalty is unconstitutional several times over and must be declared unlawful and enjoined.  The Commission's new rule punishes investors for engaging in constitutionally protected litigation activity involving ownership of LIHTC projects—with no regard to who brought the suit and no regard to who ultimately prevailed—in violation of the First Amendment.  The Litigation Penalty also violates the Contracts Clause and Due Process Clause because it retroactively strips investors of valuable contractual and property rights, thereby destroying legitimate reliance interests and investment-backed expectations.  The Litigation Penalty, moreover, exceeds the scope of the Commission's delegated authority under the LIHTC program, and seeks to rewrite federal law in violation of the Supremacy Clause.

COMPLAINT - 5
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    Finally, the Litigation Penalty fails any level of scrutiny under the Equal Protection Clause—

2    whether strict scrutiny or rational basis review—because even if the Commission were

3    attempting to advance a legitimate policy goal (which it is not), there is no conceivable rational

4    basis for punishing a party to litigation without regard to the merits of that party's position, and

5    based solely on that party's status as an investor-owner.

6           16.    The WSHFC recently proposed a revision to the Litigation Penalty that (if passed)

7    would give the Commission discretion to decide for itself the merits of a party's position in

8    litigation over LIHTC ownership interests.  This proposed revision does nothing to ameliorate

9    the flaws of the Litigation Penalty and is also unconstitutional several times over.  As noted, the

10   Commission lacks *any* authority to impose retroactive rules that reallocate ownership rights in

11   LIHTC projects.  Nor does the Commission have authority to impose new burdens on investors

12   by forcing them to document and justify the reasonableness of their litigation conduct.  The

13   proposed amendment, if adopted, would compound the Litigation Penalty's constitutional

14   deficiencies by improperly usurping the role of the courts to adjudicate LIHTC partnership

15   disputes and permitting the Commission to second-guess and override a court's determination of

16   the parties' rights.

17          17.    The Commission's actions to date leave no doubt that the WSHFC intends to

18   wield its purported authority to attempt to override court decisions construing LIHTC partnership

19   agreements, including this Court's decision in *SHAG*.  The Commission has stated its

20   unequivocal view that nonprofit general partners *should* have a self-triggering right to purchase

21   LIHTC properties at the end of the compliance period at below-market prices.  There is no

22   question that the Commission would administer the Litigation Penalty in accordance with that

23   manifestly erroneous interpretation of the LIHTC program if the proposed revisions are enacted.

24          18.    At bottom, the Commission seeks to override Section 42 by effectively creating a

25   Washington state-law self-triggering below-market purchase option for LIHTC general partners,

26   in direct contravention of judicial decisions and the policy choices made by Congress.  The

COMPLAINT - 6
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   Litigation Penalty is unconstitutional, *ultra vires*, and a paradigmatic example of arbitrary

2   government action.  This Court's intervention is needed to prevent the Commission from

3   exceeding the statutory and constitutional limits on its authority.

4   ## NATURE OF THE ACTION

5   19.     This is a civil action seeking a declaration that the Litigation Penalty violates the

6   First Amendment right to petition, the Fourteenth Amendment Equal Protection and Due Process

7   Clauses, and the Contracts and Supremacy Clauses of the United States Constitution.

8   20.     Plaintiffs seek an injunction prohibiting the WSHFC or any of its members,

9   employees, or agents from enforcing the Litigation Penalty, or from enacting any new rule or

10  regulation or engaging in any future conduct based on the Commission's erroneous interpretation

11  of Section 42 as set forth in the Report.

12  ## THE PARTIES

13  21.     Plaintiff Alden Torch Financial LLC is a limited liability company specializing in

14  investment management with its principal place of business in Denver, Colorado.  Alden Torch

15  manages a portfolio of LIHTC investments on behalf of investors in LIHTC projects located

16  throughout the country, including in Washington.  Alden Torch is responsible for managing

17  Plaintiffs AMTAX Holdings 260, LLC ("AMTAX 260") and AMTAX Holdings 114, LLC

18  ("AMTAX 114").  Alden Torch also owns or manages limited partner interests in six other

19  LIHTC projects in Washington.

20  22.     Plaintiff AMTAX 260 is a limited liability company that was the investor limited

21  partner in a LIHTC project located in Washington.  As alleged further below, AMTAX 260 was

22  one of the defendants in *SHAG*, in which a nonprofit general partner sought unsuccessfully to

23  force AMTAX 260 and other investor-owners out of seven LIHTC partnerships against their will

24  and at prices that were millions of dollars below fair market value.

25  23.     Plaintiff AMTAX 114 is a limited liability company that is the investor limited

26  partner in another LIHTC project located in Washington.  AMTAX 114 was sued by its for-

1    profit developer partner Hidden Hills Management, LLC ("HHM"), which sought to force

2    AMTAX 114 to sell its interest in the LIHTC partnership to HHM at a certain price ("*Hidden*

3    *Hills*").  That suit, too, was unsuccessful.

4          24.      Defendant WSHFC is the Washington state agency responsible for administering

5    the federal LIHTC program in Washington.  The WSHFC is located at 1000 2nd Avenue, Suite

6    2700, Seattle, Washington 98104.

7          25.      Defendant Bill Rumpf is the Commission Chair of the WSHFC, named in his

8    official capacity.

9          26.      Defendant Lisa J. Brown is a member of the WSHFC, named in her official

10   capacity.

11         27.      Defendant Diane Klontz is a member of the WSHFC, named in her official

12   capacity.

13         28.      Defendant Duane Davidson is a member of the WSHFC, named in his official

14   capacity.

15         29.      Defendant Jason Richter is a member of the WSHFC, named in his official

16   capacity.

17         30.      Defendant Rich Nafziger is a member of the WSHFC, named in his official

18   capacity.

19         31.      Defendant Albert Tripp is a member of the WSHFC, named in his official

20   capacity.

21         32.      Defendant Randy Robinson is a member of the WSHFC, named in his official

22   capacity.

23         33.      Defendant Alishia Topper is a member of the WSHFC, named in her official

24   capacity.

25         34.      Defendant Lowel Krueger is a member of the WSHFC, named in his official

26   capacity.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

35.     Defendant Ken A. Larsen is a member of the WSHFC, named in his official capacity.

36.     Defendant Wendy L. Lawrence is a member of the WSHFC, named in her official capacity.

## JURISDICTION AND VENUE

37.     This Court has original subject matter jurisdiction over these claims arising under the United States Constitution pursuant to 28 U.S.C. § 1331.

38.     Plaintiffs seek declaratory and injunctive relief pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. §§ 2201 and 2202, which grant this Court authority to declare the rights and legal relations surrounding questions of actual controversy that exist between Plaintiffs and Defendants.

39.     Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, this Court has authority to enjoin Defendants in their official capacity from violating federal law, but only if the individual WSHFC members are named as defendants.

40.     Venue is proper within the Western District of Washington pursuant to 28 U.S.C. § 1391, because the WSHFC is located within this judicial district and a substantial part of the events giving rise to this lawsuit occurred in this judicial district.

## FACTUAL ALLEGATIONS

### A.     *The LIHTC Program*

41.     Congress created the LIHTC program through the Tax Reform Act of 1986 to promote private investment in affordable housing throughout the United States.  Under the LIHTC program, Congress provides federal tax credits to individual states based on population. Each state then allocates the credits to affordable housing projects through a competitive process that is administered by individual state housing finance agencies but must comply with the requirements in Section 42 of the Internal Revenue Code ("Section 42").  26 U.S.C. § 42.

42.     LIHTC projects are typically structured as a limited partnership between an

COMPLAINT - 9
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

investor limited partner, who provides the necessary capital to fund an affordable housing project, and a general partner, who is responsible for developing and operating it.  The general partner—sometimes referred to as a "sponsor"—is usually either a for-profit developer or a qualified nonprofit organization focused on the development of affordable housing.  The limited partner supplies the vast majority of the capital for the LIHTC project in exchange for an ownership interest and is able to claim the federal tax credits proportionate to its ownership share.  The tax credits are claimed over a 10-year period, but the project must continue to be used for affordable housing for at least 15 years (referred to in the LIHTC industry as the "compliance period").

43.     At the inception of a LIHTC project, the general partner is typically willing to allow the limited partner investor to take a very large ownership stake to ensure the largest possible upfront investment in the project.  General partners participating in the LIHTC program thus seek to raise as much capital as possible while still allowing them to be real partners in the projects.  As a result, investor limited partners typically supply 99% or more of the capital in exchange for a comparable ownership stake.  Although the general partner usually has a very small ownership stake, it typically receives substantial fees for developing and operating the project, as well as most of the cash flow generated from the property's operations.

44.     Because the LIHTC program involves awarding tax credits to promote investment in affordable housing, the limited partner investors claiming those tax credits must have a bona fide *ownership* interest of the properties.  Under the longstanding "economic substance" doctrine of tax law, an investor is deemed an owner of property for tax purposes—and thus eligible to receive LIHTC credits and other tax benefits—*only* if the investor's involvement has economic substance independent of the tax treatment, including both upside potential and downside risk based on the economic performance of the investment.  *See*, *e.g.*, *Historic Boardwalk Hall, LLC v. C.I.R.*, 694 F.3d 425 (3d Cir. 2012); *Frank Lyon Co. v. United States*, 435 U.S. 561, 572-73 (1978) (owners must invest in property for purposes of generating a profit and not solely to

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   generate tax credits and deductions); 26 U.S.C. § 7701(o)(1) (economic substance doctrine

2   requires transaction to "change[] in a meaningful way (apart from Federal Income tax effects) the

3   taxpayer's economic position, and [that] the taxpayer has a substantial purpose (apart from

4   Federal income tax effects) for entering into such transaction."); IRS Notice 2010-62, Interim

5   Guidance Under the Codification of the Economic Substance Doctrine.

6          45.     If an investor in a LIHTC project is *not* a bona fide owner—*i.e.*, if it has no ability

7   to profit from property appreciation apart from any tax benefits—then it is ineligible to claim the

8   tax credits. *See Historic Boardwalk Hall*, 694 F.3d at 460 (investor that "could never expect to

9   share in any upside" apart from tax benefits was ineligible for federal historic tax preservation

10  credits); *see also* 26 C.F.R. § 1.42-4(b) (providing that "losses, deductions, or credits attributable

11  to the ownership and operation of a [LIHTC property] may be limited or disallowed under other

12  provisions of the Code or principles of tax law"); Thomas W. Giegerich, *The Monetization of*

13  *Business Tax Credits*, 12 Fla. Tax Rev. 709, 749 (2012) (noting that the investor "must be the

14  'owner' of the LIHTC project under substantive federal income tax principles").

15         46.     Thus, the entire structure of the LIHTC program turns on having limited partner

16  investors who are bona fide owners of the affordable housing projects, to ensure that the

17  recipients of the tax credits are complying with the economic substance doctrine.  Indeed, this

18  "ownership" model was specifically designed to replace earlier programs involving "passive

19  loss" real estate development vehicles that Congress perceived as being abused by the tax shelter

20  industry.  *See* Tracy A. Kaye, *Sheltering Social Policy in the Tax Code: The Low-Income*

21  *Housing Tax Credit*, 38 Vill. L. Rev. 871, 873 (1993); Michael J. Graetz & Deborah Schenk,

22  *Federal Income Taxation: Principles and Policies*, 371-72 (7th ed. 2013) (describing efforts in

23  the early to mid-1980s to eliminate tax shelters created through "passive investments,"

24  culminating in the enactment of the Tax Reform Act of 1986); Clinton G. Wallace, *The Case for*

25  *Tradable Tax Credits*, 8 N.Y.U. J.L. & Bus. 227, 240 (2011) ("It is theorized that, in addition to

26  filling the gap in low-income housing, the LIHTC acted as a replacement of sorts for the tax

1  shelters for individuals that had been eliminated by the passive loss provisions").

2  **B.    *Section 42(i)(7) authorizes qualified nonprofits to hold a below-market ROFR***

3  47.    In the late 1980s, Congress considered various mechanisms for the investor

4  limited partners in a LIHTC project to potentially transfer their ownership interests at the end of

5  the 15-year compliance period.

6  48.    Following the creation of the LIHTC program, Senators George J. Mitchell of

7  Maine and John C. Danforth of Missouri convened the bipartisan Mitchell-Danforth Task Force

8  on the Low-Income Housing Tax Credit, which was tasked with reviewing the progress of the

9  LIHTC program, defining the appropriate role of the LIHTC program in the overall housing

10  policy framework, and proposing improvements to the program going forward.  *See* Elizabeth

11  Mitchell, et al., *Report of the Mitchell-Danforth Task Force on the Low-Income Housing Tax*

12  *Credit*, at 1 (Jan. 1989).

13  49.    Among the Task Force's proposed improvements was to authorize below-market

14  self-triggering *purchase options* to encourage increased participation by nonprofit groups in the

15  ownership of low-income housing.  *Id.* at 4.  To that end, the Task Force recommended that

16  "non-profit organizations and tenant cooperatives should be able to negotiate below-market

17  purchase options during a project's initial development and financing without disqualifying

18  investors from claiming the Credit while they own the project."  *Id.* at 19.

19  50.    Senate Bill 980, also known as the Low-Income Tax Credit Act of 1989, included

20  many of the recommendations set forth in the Mitchell-Danforth Task Force Report, including a

21  provision authorizing a below-market purchase option for a qualifying nonprofit organization:

22  CERTAIN PURCHASE OPTIONS DISREGARDED- For purposes of this title,
the determination of whether any qualified low-income building is owned by the
23  taxpayer shall be made without regard to any option by a qualified nonprofit
organization (as defined in subsection (h)(5)(C)) to acquire such building at less
24  than fair market value after the close of the compliance period. . . .

25  S.B. 980, 101st Cong. (1st Sess. 1989).

26  51.    Professor Tracy Kaye, who served as Tax Legislative Assistant to Senator

COMPLAINT - 12
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

Danforth from 1987 to 1991, explained in a 1993 law review article that the purpose of the proposed below-market self-triggering purchase option in Senate Bill 980 was "to allow nonprofit organizations and tenant cooperatives to negotiate below-market purchase options with the investors during a project's initial development without disqualifying the investors from claiming the credit while they own the property."  Kaye, 38 Vill. L. Rev. at 875.

52.     Others in Congress, however, opposed *any* mechanism for a below-market transfer based on concerns over its implications for tax law.  *See id.* at 892-97 (discussing legislative history).  As noted above, the longstanding "economic substance" doctrine deems a party a true owner of property only if there is a reason to participate in the arrangement aside from tax purposes—*i.e.*, if the party has both *upside potential* and *downside risk*.  *See Historic Boardwalk Hall*, 694 F.3d at 460.  If the general partner held a self-triggering below-market purchase option, then the investor limited partners would have no upside potential in any appreciation of the property—since the general partner would always exercise the option and capture 100% of the appreciation for itself—and the investors could not be treated as true owners of the property for tax purposes (thereby making them ineligible for the LIHTC tax credits).  *See* Kaye, 38 Vill. L. Rev. at 892 (observing that "[t]he right to appreciation has been an important incident of ownership for purposes of determining the tax owner of property under both the case law and the administrative guidance provided by the IRS").  In sum, "there was congressional concern that the grant of a below-market option (as proposed by [Senate Bill 980]) was a substantial enough relinquishment of one of the benefits of ownership that true ownership was at issue." *Id.* at 893.

53.     Congress ultimately reached a compromise between those who favored *no* below-market transfer mechanism and those who favored a self-triggering purchase option by authorizing a below-market *right of first refusal*.  *See* Kaye, 38 Vill. L. Rev. at 896 (discussing "compromise" that "culminated" in enactment of ROFR provision).

54.     In the Omnibus Budget Reconciliation Act of 1989, Congress adopted Section

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    42(i)(7), which authorized LIHTC projects to permit certain eligible stakeholders a "right of 1st

2    refusal" to purchase LIHTC properties at the end of the 15-year compliance period for "the

3    principal amount of outstanding indebtedness secured by the building" plus "all Federal, State,

4    and local taxes attributable to such sale."  26 U.S.C. §42(i)(7)(B).  This below-market purchase

5    right, however, can only be exercised *if the requirements for exercising a right of first refusal—*

6    *including the receipt of a bona fide third party offer that the investor-owner is willing to*

7    *accept—have been met.*

8        55.    Congress did not define "right of 1st refusal" in Section 42(i)(7), but that concept

9    is a legal term of art that has a well-established meaning at common law.  Under the

10   longstanding definition of that term, a ROFR is a purely defensive right that prohibits an owner

11   from selling its property without first offering it to the ROFR holder.  A ROFR is triggered only

12   when an owner decides to sell the property and receives a bona fide offer from a third-party

13   purchaser.  *See*, *e.g.*, *Jones v. Riley*, 471 S.W.2d 650, 658-59 (Tex. App. Ct. 1971) ("a 'bona fide

14   offer' . . . had to not only be made in good faith, but it had to also be of such a nature and in such

15   form that it could be, by an acceptance thereof by the offeree, caused to ripen into a valid and

16   binding contract that could be enforced by any party to it").  At that point, the owner must

17   present the offer to the ROFR holder and give it the opportunity to buy the property at the

18   specified price.  Because a ROFR is fundamentally defensive, it can never be used to compel a

19   sale over the objection of the owners of the property.  *See Bennett Veneer Factors Inc. v. Brewer*,

20   73 Wn.2d 849, 853–54, 441 P.2d 128 (1968) (unlike a "normal option contract" a right of first

21   refusal is a "preemptive right" that gives "the prospective purchaser the right to buy upon terms

22   established by the seller; but only if the seller decides to sell"); 25 R. Lord, Williston on

23   Contracts (4th ed. 2002), §67:85, pp. 503-04 ("[t]he 'right of first refusal' or 'preemption' is

24   conditioned upon the willingness of the owner to sell").

25       56.    When Congress enacted Section 42(i)(7), it was well aware of the key difference

26   between a self-triggering option and a ROFR:  the ability of the holder to compel an unwilling

COMPLAINT - 14
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

owner to sell.  While "an option allows a holder to compel the sale of property," a ROFR "is

contingent or conditioned on the owner's willingness to sell."  Kaye, 38 Vill. L. Rev. at 897,

n.139.  As Professor Kaye explains, "[t]he compromise was most likely structured in this manner

because the [ROFR] *leaves more power in the hands of the owner* whereas a purchase option

would have given more discretion to the prospective buyer."  *Id.* at 896 (emphasis added).  In

other words, because a ROFR cannot be exercised in the absence of a bona fide and enforceable

offer that the investor-owner is prepared to accept, Congress concluded that a below-market

ROFR—unlike a below-market self-triggering purchase option—would not undercut the

ownership status of LIHTC investors.

57.     The Congressional Record for the passage and later amendment of Section

42(i)(7) leaves no doubt that Congress intended a ROFR in a LIHTC project to be exercisable if

and only if the owner decides to sell.  The House Committee Report for the Omnibus Budget

Reconciliation Act of 1989, which first added the Section 42(i)(7) safe harbor, states:

> The bill provides that any determination as to whether Federal income tax benefits
> are allowable to a taxpayer with respect to a qualified low-income building shall
> be made without regard to whether the tenants are given the [ROFR] (with one
> year's notice) to purchase the building, for a minimum purchase price, ***should the
> owner decide to sell*** (at the end of the compliance period).

H.R. Rep. No. 101-247 at 2665 (1989), 1989 U.S.C.C.A.N. 1906 (emphasis added).

58.     Similarly, the October 18, 1990 Senate Congressional Record for the Omnibus

Budget Reconciliation Act of 1990—which expanded Section 42(i)(7) to authorize a ROFR for

qualified nonprofits—states:

> Under present law, any determination as to whether Federal income tax benefits
> are allowable to a taxpayer with respect to a qualified low-income building is
> made without regard to whether the tenants are given the [ROFR] to purchase the
> building, for a minimum purchase price, ***should the owner decide to sell to them***
> (at the end of the compliance period).

Cong. Rec. S.30528 (daily ed. Oct. 18, 1990) (emphasis added).

59.     In short, both the text of Section 42(i)(7) and its legislative history leave no doubt

that Congress made an *intentional* and *unambiguous* policy decision to authorize a right of first

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   refusal—rather than a unilateral purchase option—in LIHTC partnership agreements. Congress'

2   authorization of a below-market ROFR was the product of an explicit legislative compromise

3   that provided a conditional below-market transfer right to nonprofit general partners while

4   ensuring that investments in LIHTC projects retained sufficient economic substance to remain

5   eligible for tax credits.  LIHTC stakeholders, in turn, have relied for decades on the clear text and

6   history of Section 42(i)(7) in determining the property rights they acquired when investing in

7   LIHTC projects.

8       **C.    *Recent disputes over Section 42(i)(7) and transfers of LIHTC properties***

9       60.    Although the ROFR provision in Section 42(i)(7) was the product of extensive

10  debate, discussion, and attention when it was enacted in 1989 and expanded to include nonprofits

11  in 1990, there were few disputes over the Section 42(i)(7) ROFR until relatively recently.

12      61.    When a LIHTC project fails to appreciate in value over the 15-year compliance

13  period, the limited partner investor-owners are typically willing to sell the property for the

14  Section 42(i)(7) debt-plus-exit-taxes price since the investor would not be able to realize any

15  additional gain by selling the property at fair market value.

16      62.    However, some LIHTC properties in certain areas—including Washington—have

17  increased substantially in value in recent years.  As noted above, the economic substance

18  doctrine *requires* that LIHTC investor-owners have the ability to share in this upside potential if

19  they are to be deemed bona fide owners of the projects for purposes of claiming the tax credits.

20      63.    Some LIHTC general partners—aided by sophisticated counsel and political allies

21  such as the WSHFC—have taken increasingly aggressive and unfounded legal positions in an

22  attempt to block their investor limited partners from capturing *any* of the appreciation in value of

23  the LIHTC projects in which they invested.

24      64.    One specific tactic general partners have employed is to claim—notwithstanding

25  the unambiguous text and history of Section 42(i)(7)—that they are entitled to *unilaterally*

26  exercise a contractual ROFR permitted under Section 42(i)(7) to force investors out of the

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  partnership and acquire the property at the below-market debt-plus-taxes price.  That is, the

2  general partners claim a contractual right to self-trigger the ROFR and capture all of the LIHTC

3  project's appreciation in value.

4        65.     Courts in this district and others have repeatedly rejected such claims.

5        66.     In 2017, for example, a Washington-based nonprofit general partner known as

6  "SHAG" filed a lawsuit in this Court against Plaintiff AMTAX 260 and other LIHTC limited

7  partners seeking to compel the sale to SHAG of seven LIHTC properties in Washington based on

8  SHAG's purported exercise of a below-market ROFR permitted under Section 42(i)(7).  *See*

9  *Senior Housing Assistance Group v. AMTAX Holdings 260, LLC, et al.*, No. C17-1115-RSM,

10 2019 WL 1417299 ("*SHAG*").

11       67.     Although SHAG was the nominal plaintiff and purported to be an eligible

12 nonprofit holder of the Section 42(i)(7) ROFR in question, it became apparent during the

13 litigation that SHAG was being directed and controlled by its for-profit developer partner,

14 Pacific Northern Construction Company ("PNCC").  Discovery revealed numerous ways in

15 which PNCC's principal had managed and controlled SHAG for PNCC's benefit and had

16 specifically taken control of SHAG's below-market ROFR.  The Commission nonetheless turned

17 a blind eye to this affiliation and control by a for-profit developer and certified that SHAG

18 remained a "qualified nonprofit" under 26 U.S.C. §42(h)(5)(C)(ii) that was eligible to hold a

19 Section 42(i)(7) ROFR.

20       68.     Despite the WSHFC's decision to overlook SHAG being affiliated with and

21 controlled by a for-profit developer, this Court comprehensively rejected SHAG's claims on the

22 merits.

23       69.     SHAG argued that its Section 42(i)(7) ROFR under the governing partnership

24 agreements allowed it to purchase seven LIHTC properties for the statutory minimum price of

25 outstanding debt plus exit taxes, even though—as a result of appreciation—the fair market value

26 of the properties was collectively tens of millions of dollars higher.  SHAG further alleged that it

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  could exercise its ROFR unilaterally, even in the absence of acceptable, bona fide third-party

2  purchase offers.

3        70.    In two separate decisions, Chief Judge Ricardo Martinez squarely rejected

4  SHAG's claim that its Section 42(i)(7) ROFR had been triggered and validly exercised.

5        71.    First, on February 19, 2019, Judge Martinez entered an order on cross-motions for

6  summary judgment rejecting SHAG's argument that, "even though the words 'right of first

7  refusal' are contained in [the relevant provision of the partnership agreements], this is not a

8  common law right of first refusal, but really permits SHAG to have an option to buy at the

9  statutory minimum price."  *See Senior Hous. Assistance Group v. AMTAX Holdings 260, LLC, et*

10  *al.*, No. C17-115 RSM, 2019 WL 687837, at *5 (W.D. Wash. Feb. 19, 2019).

11        72.    Focusing on the terms of the partnership agreements, Judge Martinez noted that,

12  "[o]n the very same page" containing Section 7.4L of the partnership agreements—which

13  granted SHAG its Section 42(i)(7) ROFR—"Section 7.4J provides the General Partner an

14  'option'" to purchase the LIHTC properties for fair market value.  Given the clear option right in

15  Section 7.4J, the Court reasoned that "[i]t is hard to imagine how the parties to these contracts

16  could have inadvertently intended [the below-market ROFR in Section] 7.4L to provide the

17  equivalent of an option right."  *Id.* at *6.

18        73.    The Court thus concluded on summary judgment that "Section 7.4L's ROFR

19  requires SHAG to meet the ordinary definition of a right of first refusal (in addition to its other

20  requirements)," but reserved for trial whether certain third party "offers" were sufficient to

21  trigger SHAG's ROFR as to any of the seven properties at issue.

22        74.    Following a bench trial, the Court issued another order on March 29, 2019 finding

23  that SHAG's ROFR was neither triggered nor validly exercised in connection with *any* of the

24  seven properties at issue.  *See Senior Hous. Assistance Group v. AMTAX Holdings 260, LLC, et*

25  *al.*, No. C17-115 RSM, 2019 WL 1417299 (W.D. Wash. Mar. 29, 2019).

26        75.    Citing longstanding principles of common law, Judge Martinez first concluded

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   that, "[f]or each of SHAG's ROFRs to be triggered, the owner of the property at issue must

2   receive 'a bona fide offer from a third party, acceptable to the property owner.'" *Id.* at *9

3   (quoting *Matson v. Emory*, 36 Wn. App. 681, 683, 676 P.2d 1029 (1984)).  The court further

4   held that, "[t]o be bona fide, an offer must be 'made in good faith; without fraud or deceit,' and

5   must be 'sincere' and 'genuine.'" *Id.* at *10 (quoting Black's Law Dictionary (10th ed. 2014)).

6   And the court concluded that, "[e]ven if a third party's interest in the property is genuine, to

7   constitute an offer the communication in question must be enforceable and not merely an

8   expression of interest or invitation to negotiate." *Id.* (citing *Rennick v. O.P.T.I.O.N. Care, Inc.*,

9   77 F.3d 309, 315 (9th Cir. 1996)).

10       76.     Applying these principles, the Court held that none of the multiple so-called

11   "offers" on which SHAG relied constituted genuine and enforceable offers.  The Court found

12   further that certain of the "offers" were "not made in good faith and [] not sincere or genuine,"

13   but were instead "sham offer[s]" made by a friend of PNCC's principal "solely as a business

14   favor that could pay dividends in future business dealings." *Id*.  Moreover, even if the offers had

15   been bona fide, they could not trigger SHAG's ROFR because the LIHTC property owners

16   "never formed or expressed a willingness to accept" them.  *Id.*

17       77.     Based on these findings, the Court also concluded that SHAG was not entitled to

18   equitable relief because it acted with unclean hands.  As Judge Martinez explained, SHAG

19   "engaged in inequitable, bad faith, and unjust conduct when it secretly colluded with [a friend

20   and business associate of PNCC's principal] to procure sham offers from straw buyers" for the

21   projects in question.  *Id.* at *12.  The court thus entered judgment for AMTAX 260 and the other

22   LIHTC investors, holding that SHAG's ROFR was "neither triggered nor validly exercised." *Id.*

23   at *13.

24       78.     Also in 2017, HHM, a Washington-based for-profit developer general partner,

25   sued Plaintiff AMTAX 114—another investor limited partner managed by Plaintiff Alden

26   Torch—in this Court in Tacoma.  HHM's lawsuit sought to force AMTAX 114 to exit a LIHTC

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   partnership at a price that AMTAX 114 believed was too low based on HHM's improper

2   manipulation of what was supposed to be an impartial appraisal process.  Judge Ronald Leighton

3   agreed with AMTAX 114, finding that HHM's manipulation had rendered the prior appraisal

4   process "tainted beyond salvation."  *See Hidden Hills Management v. AMTAX Holdings, LLC*,

5   No. C17-6048 RBL, 2019 WL 1957930, at * 7 (W.D. Wash. May 2, 2019).  The Court also

6   found in AMTAX's favor on its counterclaim that HHM had indemnified AMTAX 114 against

7   any reduction in its exit price based on the environmental condition of the property, and awarded

8   AMTAX 114 approximately $350,000 in attorneys' fees.  *See id.*

9       79.     These are by no means the only cases to reject dubious attempts by general

10  partners to buy LIHTC properties under unjustifiably favorable terms.  In another case involving

11  a LIHTC project in Brooklyn, a nonprofit general partner sued the project's limited partner

12  investors, claiming that it had the right to exercise its Section 42(i)(7) ROFR even though the

13  limited partners (who were 99.9% owners of the property) were not willing to sell.  *See Riseboro*

14  *Community Partnership v. SunAmerica Housing Fund 682*, No. 18CV7261RJDVMS, 2020 WL

15  5097252 (E.D.N.Y. 2020).  The court flatly rejected that claim, reiterating that a ROFR is "not

16  an option" and may not be exercised "absent the common law conditions precedent."  *Id.* at * 7.

17  As the court explained, a "ROFR does not give its holder the power to compel an unwilling

18  owner to sell," and "stands in contrast with an 'option' to purchase, which may be triggered

19  unilaterally, even against the owner's unwillingness to sell."  *Id.* at *4.  The court noted that

20  because the term "'right of 1st refusal' [as used in Section 42(i)(7)] is a common law term of art,

21  Congress is 'presumed, unless the statute otherwise dictates,' to have incorporated its common

22  law meaning."  *Id.*  The *Riseboro* decision thus confirms that the holder of a ROFR authorized

23  by Section 42(i)(7) cannot exercise its below-market purchase right unless there is a bona fide

24  third-party purchase offer that the owners are willing to accept.

25      **D.    The Washington State Housing Finance Commission**

26      80.     Under the LIHTC program, Congress provides federal tax credits to individual

COMPLAINT - 20
No.

1    states based on population.  Each state then allocates the credits to affordable housing projects

2    through a competitive process that is administered by individual state housing finance agencies

3    but must comply with the requirements in Section 42.  26 U.S.C. § 42(m).

4            81.     The WSHFC is the "housing credit agency" responsible for administering the

5    federal LIHTC program in Washington by allocating Washington's annual allotment of federal

6    tax credits to specific projects based on neutral selection criteria set forth in a "qualified

7    allocation plan."  26 U.S.C. § 42(m); *see also* Government Accountability Office ("GAO"), *Low-*

8    *Income Housing Tax Credit: Joint IRS-HUD Administration Could Help Address Weaknesses in*

9    *Oversight* at 4-8 (July 2015) ("GAO Report"), available at

10   https://www.gao.gov/assets/680/671419.pdf.

11           82.     The WSHFC's delegated authority under the federal LIHTC program is carefully

12   circumscribed.  As explained in the GAO Report, state housing commissions may evaluate "the

13   financial feasibility of each project" and "its viability as a qualified low-income housing project

14   through the 10-year credit period."  GAO Report at 14.  In prospectively allocating tax credits to

15   specific projects, state commissions also have some discretion to favor projects that, for example,

16   have a nonprofit general partner or that have a longer affordability period.  And, once a project

17   enters service, the state agency may "monitor[] LIHTC properties for compliance with *program*

18   *requirements* (for example, health and safety standards, rent ceilings, income limits, and tenant

19   qualifications)."  *Id.* (emphasis added).

20           83.     The WSHFC is also responsible for ensuring that nonprofits participating in the

21   LIHTC program are not affiliated with or controlled by for-profit entities, which would render

22   them ineligible to receive a ROFR under Section 42(i)(7).  26 U.S.C. § 42(h)(5)(C)(ii).

23           84.     But absolutely nothing in the relevant statutes or regulations delegates to state

24   commissions authority to *interpret* LIHTC partnership agreements after they are signed or to

25   reallocate contractual rights between investor-owners and general partners.  Those questions are

26   addressed solely by Section 42 and the terms of the partnership agreements, and state

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    commissions have zero authority over such issues.  Any attempt by the Commission to address

2    these matters through regulation or advocacy is thus inherently *ultra vires* and in direct conflict

3    with federal law.

4    85.    Ultimately, it is the IRS, not the WSHFC, that is responsible for administering the

5    LIHTC program consistent with the requirements of Section 42.  As the GAO Report explains,

6    the "IRS administers the LIHTC program by developing regulations and guidance and is

7    responsible for overseeing [state housing finance agencies] and taxpayer compliance."  GAO

8    Report at 11.  Yet, as alleged further below, the WSHFC has announced, in direct contravention

9    of federal tax law, that it seeks to flout the economic substance doctrine—and the text, history,

10   and purpose of Section 42(i)(7)—by treating below-market ROFR in LIHTC partnership

11   agreements as unilateral below-market purchase options.

12   86.    Each year, the WSHFC must submit Form 8610 to the IRS, in which it certifies

13   under penalty of perjury that it has complied with all aspects of the LIHTC program.  The GAO,

14   however, has previously identified numerous deficiencies in the administration of the LIHTC

15   program by state housing agencies such as the WSHFC.  GAO Report at 18-29.  Most notably,

16   the GAO found in 2015 that many state housing agencies (a) have written policies that conflict

17   with Treasury regulations and/or the Internal Revenue Code, (b) submit reports to the IRS that

18   contain errors, and/or (c) fail to submit regular reports to the IRS altogether.  *Id.* at 20-21.

19   87.    The GAO has criticized the IRS for engaging in "minimal" oversight of state

20   housing finance agencies, with the IRS performing a mere seven audits of state housing agencies

21   between 1986 and 2015.  *Id.* at 18-21.  The GAO concluded that it could not establish whether

22   state housing agencies were following even the "basic requirements" of the federal LIHTC

23   program, *id.* at 25, and accordingly recommended a significant expansion of federal agency

24   oversight of state administration of the LIHTC program, including regular monitoring, to help

25   address deficiencies that the GAO identified, *id.* at 37-39.

26   **E.    *The WSHFC seeks to punish investors that refuse to capitulate to general***

COMPLAINT - 22
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1      *partners' efforts to buy out the investor-owners at below-market terms*

2      88.      Having soundly lost in court about the interpretation of exit rights under LIHTC

3  partnership agreements, LIHTC general partners and their advocates in state and federal

4  government took several improper and unconstitutional actions in an attempt to evade or

5  override the unfavorable judicial decisions and divest LIHTC investors of their contract and

6  property rights.  A chronological summary of these multiple actions is attached hereto as **Exhibit**

7  **A**.  As alleged below, the WSHFC became an eager partner in those efforts, notwithstanding its

8  utter lack of authority to do so.

9             *1.      The WSHFC lobbies for changes to federal law to override SHAG*

10      89.      On June 4, 2019, United States Senator Maria Cantwell of Washington introduced

11  legislation that would retroactively abrogate and modify countless LIHTC partnership

12  agreements by effectively converting the Section 42(i)(7) ROFR into a unilateral purchase option

13  for nonprofit general partners.  *See* Affordable Housing Credit Improvement Act of 2019 (Senate

14  Bill 1703).  Specifically, Section 303(b)(3) of this bill would amend Section 42(i)(7) to state that,

15  "[f]or purposes of determining whether an option, including a right of first refusal, to purchase

16  property is described in the preceding sentence [i.e., covered by Section 42(i)(7)]—(i) such

17  option or right of first refusal *may be exercised with or without the approval of the [owner]*, and

18  (ii) a right of first refusal may be exercised *in response to any offer to purchase the property,*

19  *including an offer by a related party*."  S. 1703, 116th Cong., 1st Sess., Title III, § 303(b)

20  (emphases added).  This legislation accordingly would completely redefine the meaning of the

21  Section 42(i)(7) ROFR by eliminating the critical common-law preconditions of a bona fide

22  third-party offer and the owner's approval to sell the property.

23      90.      The Cantwell legislation describes these major substantive changes to Section

24  42(i)(7) as a mere "clarification" of the law.  In reality, the proposed legislation would override

25  the holding in *SHAG*, upend the carefully negotiated 30-year old legislative compromise at the

26  heart of Section 42(i)(7), strip investors of highly valuable contract and property rights, and leave

COMPLAINT - 23
No.

1   investors in partnerships that have no economic substance aside from their tax benefits.  In other

2   words, the legislation would "clarify" the law in a manner that is precisely what Congress

3   rejected in its carefully crafted compromise that culminated in Section 42(i)(7).

4       91.    Worse still, unlike previous bills that would have modified the LIHTC program

5   on a prospective basis only, the Cantwell bill would apply retroactively to transform the Section

6   42(i)(7) ROFR into a below-market unilateral purchase option in *existing* partnership

7   agreements.  Given that the Cantwell bill purports to retroactively rewrite LIHTC partnership

8   agreements to shift the right to property appreciation from investor-owners to general partners by

9   completely changing the nature of the property rights in those agreements, this legislation, if

10  enacted, would likely be found to violate, *inter alia*, the Takings Clause of the United States

11  Constitution.

12      92.    The Takings Clause mandates that "private property [shall not] be taken for public

13  use, without just compensation." U.S. Const. amend. V, XIV.  A taking occurs when the

14  government transfers property to itself or to *another private party.  Stop the Beach Renourishment,*

15  *Inc. v. Florida Dep't of Envtl. Prot.*, 560 U.S. 702, 713 (2010); *see also Kelo v. City of New*

16  *London, Conn.*, 545 U.S. 469, 477 (2005) (explaining that a taking occurs when the government

17  transfers property from one private party to another for a public use).

18      93.    Because Section 303 would give general partners a self-triggering below-market

19  purchase option, it would deprive investor-owners of any right to benefit from any appreciation—

20  since the general partner would always exercise the below-market option and capture 100% of the

21  appreciation for itself—and have the practical effect of appropriating the LIHTC properties and

22  giving them to nonprofit general partners, resulting in a *per se* taking of that real property.  *See*

23  *Horne v. Dep't of Agric.*, 576 U.S. 350, 135 S. Ct. 2419, 2427, 192 L. Ed. 2d 388 (2015) (holding

24  that "a physical appropriation of property [gives] rise to a *per se* taking, without regard to other

25  factors").

26      94.    Alternatively, Section 303 would result in a regulatory taking.  It is well established

COMPLAINT - 24
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

that "contract rights are a form of property" for purposes of the Takings Clause. *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 19 n.16 (1977); *see also Lynch v. United States*, 292 U.S. 572, 579 (1934) ("The Fifth Amendment commands that property be not taken without making just compensation. Valid contracts are property[.]").

95.    The three primary factors courts consider in determining whether a regulatory taking has occurred are:  (1) "the economic impact of the regulation on the claimant"; (2) "the extent to which the regulation has interfered with distinct investment-backed expectations"; and (3) "the character of the governmental action." *Connolly v. Pension Benefit Guaranty Corp.*, 475 U.S. 211, 225 (1986) (citing *Penn Cent. Transp. Co. v. City of N.Y.*, 438 U.S. 104, 124 (1978)).  In applying this test, the Supreme Court has been guided by the principle that the Takings Clause "was designed to bar Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Armstrong v. United States*, 364 U.S. 40, 49 (1960).

96.    All three factors indicate that Section 303 would result in a regulatory taking of the property rights of LIHTC investor-owners.  *See* Jeffrey M. Harris, *An Unconstitutional Attempt to Address Affordable Housing*, 20 Fed. Soc. Review 168 (2019) (discussing constitutional defects with Cantwell legislation).  First, the "economic impact" of Section 303 on LIHTC investors would be severe, as it would strip those investors of a highly valuable contractual right and deny them the ability to share in the upside potential of the LIHTC projects in which they invested.

97.    Second, Section 303 unquestionably interferes with distinct investment-backed expectations.  The Takings Clause "protects private expectations to ensure private investment," and "reasonable, investment-backed expectations" are to be "understood in light of the whole of our legal tradition." *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 1034-35 (1992) (Kennedy, J., concurring); *see also Eastern Enterprises v. Apfel*, 524 U.S. 498, 532 (1998). Section 303 is a paradigmatic example of a statute that would destroy reasonable and distinct investment-backed expectations of LIHTC investor-owners by transforming property rights that

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    those investors specifically negotiated and bargained for.

2        98.    Third, the "character" of the proposed government action strongly indicates a

3    taking.  If enacted, Section 303 would "single out" investors "to bear a burden that is substantial

4    in amount [and] . . . unrelated to any commitment the [investors] made or to any injury they

5    caused."  *Eastern Enterprises*, 524 U.S. at 537.  Where, as here, the government requires certain

6    individuals to forfeit their property for the benefit of the public, "the governmental action

7    implicate[s] fundamental principles of fairness underlying the Takings Clause."  *Id.*

8        99.    On information and belief, both SHAG and the WSHFC were instrumental in

9    lobbying Senator Cantwell to propose this change in the law.  While Senator Cantwell's

10    proposed legislation remains pending, the fact that some members of Congress are now seeking

11    to amend Section 42(i)(7) to retroactively grant nonprofit general partners a unilateral below-

12    market purchase option only underscores—as *SHAG* correctly held—that general partners *do not*

13    possess such rights under existing law.

14            **2.    The WSHFC adopts a new regulation to punish investors that defend**

15            **their contract and property rights in court**

16        100.    In addition to seeking changes to federal law, the Commission also set in motion

17    plans to adopt the Litigation Penalty, which punishes LIHTC investors who seek to protect their

18    contractual rights in court.  The purpose and effect of this new rule is to reallocate ownership

19    rights in LIHTC projects to help politically connected general partners; to override this Court's

20    decision in *SHAG*; and to effectively create a Washington state-law self-triggering purchase

21    option in direct contravention of the deliberate legislative compromise that Congress struck in

22    Section 42(i)(7).

23        101.    As noted above, state commissions have limited authority under federal law to

24    evaluate the feasibility and viability of LIHTC projects, and to oversee compliance with program

25    requirements.  To implement those requirements, the Washington Administrative Code requires

26    that any transfer of an interest in a LIHTC property be approved by the WSHFC.  *See* Wash.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    Admin. Code § 262-01-130(13) ("Unless the commission makes an exception, a transfer of an

2    interest in a project shall require the prior approval of the commission.  A transfer or assignment

3    without the commission's prior approval may result in a cancellation of tax credit for a

4    project.").

5         102.    According to the WSHFC, the purpose of this requirement is to allow the

6    Commission's staff to determine whether a new ownership entity would have the capacity to

7    maintain the project's compliance with the terms of the applicable regulatory agreement, and to

8    ensure that the resulting transfer agreement (which is recorded) recognized the incoming

9    ownership entity's obligation to follow those terms.  Commission approval was not previously

10   required for transfers of non-controlling limited partnership interests, which do not impact the

11   *operations* of the project given that it is the general partner—not the limited partner investors—

12   that is responsible for ensuring that program conditions (such as rent limits and tenant

13   qualifications) are being followed.

14        103.    On August 22, 2019, however, the WSHFC sought to significantly expand the

15   scope of its authority over transfers of LIHTC limited partner interests.  The Commission

16   adopted a new rule—the Litigation Penalty—under which it "will consent to a proposed Property

17   Transfer or Assignment ***only*** if it is determined that" among other things, "[t]he Transferee has

18   not engaged in litigation concerning a sponsor's ownership interest after the initial term of the

19   partnership (year 15-exit)."  WSHFC, *Tax Credit Compliance Procedures Manual*, Ch. 9

20   Property Transfers (Dec. 2019), at 3–4, *available at*

21   http://www.wshfc.org/managers/ManualTaxCredit/110_Chap09PropertyTransfers.pdf (emphasis

22   added).

23        104.    This new rule penalizes investors with an outright ban on participating in LIHTC

24   projects in Washington if they have previously been involved in *any* litigation with a general

25   partner sponsor concerning the sponsor's ownership interest.  Remarkably, the new regulation

26   imposes this ban even if the general partner initiated the litigation and the investor merely

COMPLAINT - 27
No.

defended itself, and even if the investor ultimately *prevailed* in the litigation.  To repeat:  under the Litigation Penalty, an investor that is sued by a general partner over an ownership issue, *and wins that suit on the merits*, would be categorically and permanently barred from obtaining interests in LIHTC projects in Washington.

105.    While the Litigation Penalty only specifically addresses transfers—rather than initial ownership—of LIHTC investor interests, it will inevitably apply both to investors seeking to purchase the interests of a limited partner in an existing LIHTC partnership as well as investors seeking to contribute capital to *new* LIHTC projects.  This is because the project's general partner sponsor typically serves as the original limited partner when the LIHTC partnership is first created, and the limited partner interests are later transferred to an investor after the Commission allocates tax credits to the project.

106.    The Litigation Penalty will also impair investors' rights under existing partnership agreements by deterring investors from asserting or defending their contract and property rights when ownership disputes with general partners arise.

107.    Moreover, by its terms, the Litigation Penalty is unidirectional, such that the penalty applies only to LIHTC investors, not to LIHTC general partners.  Thus, a general partner like SHAG—which was found by a federal court to have engaged in bad-faith conduct and acted with unclean hands—would remain fully eligible for the Washington LIHTC program, yet AMTAX 260 and Alden Torch (which successfully defended themselves against SHAG's meritless claims) would be categorically and permanently barred.

108.    The Litigation Penalty is *ultra vires*.  Although state housing finance commissions have limited authority under the LIHTC program to prospectively allocate tax credits and to monitor compliance with program terms, they have *no* authority to retroactively reallocate ownership rights or interfere in ownership disputes.  Those matters are governed solely by federal law and the terms of the relevant partnership agreements.

109.    The Commission has argued that the Litigation Penalty is intended to "deter

COMPLAINT - 28
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    investor members from entering a partnership for the sole purpose of extracting additional value

2    from the year 15 exit and then flipping the project for additional profit."  WSHFC, *Proposed*

3    *Change in Tax Credit Policies*, August 22, 2019 Meeting Minutes at 2, *available at*

4    http://www.wshfc.org/admin/minutes/2019Augustminutes.pdf.  As written, however, the

5    regulation broadly applies to any investors who previously engaged in litigation with a LIHTC

6    general partner—including, as noted above, transfers that typically occur at the inception of *any*

7    syndicated LIHTC investment—regardless of the purpose of their current investment or the

8    legitimacy of their prior conduct.  Thus, even if the Commission had authority to prohibit

9    investors from "extracting additional value" from their projects—which it does not—the

10   Litigation Penalty is a grossly overbroad means of pursuing that goal.

11          110.    The Commission also asserted that the Litigation Penalty was needed because

12   "[t]he traditional intent of a partnership exit has always been to *hand over the property to the*

13   *general partner once the investor member has realized their tax benefits*."  Aug. 22, 2019

14   Meeting Minutes at 1-2 (emphasis added).  That assertion is flatly contrary to the text and history

15   of the LIHTC program, as well as bedrock principles of federal tax law.  As noted above, the

16   ROFR authorized by Section 42(i)(7) was an explicit and deliberate legislative compromise

17   between those who wanted *no* below-market transfers and those who wanted general partners to

18   have a self-triggering below-market purchase option.  Although the WSHFC may not like the

19   result of that compromise, there is no serious question that Congress's adoption of a ROFR in

20   Section 42(i)(7) was an intentional and deliberate policy choice.  The WSHFC's suggestion that

21   investors were required to "hand over the property" after receiving the tax credits flouts the

22   longstanding economic substance doctrine, as an investor with no upside or downside potential

23   *apart* from the tax benefits would not be treated as a bona fide owner of the property at all.  The

24   WSHFC's justification for the Litigation Penalty is thus based on little more than a revisionist

25   history of the LIHTC program and a misguided attempt to create a Washington state-law self-

26   triggering purchase option in contravention of the decisions made by Congress.

COMPLAINT - 29
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

111.     Although the Commission has claimed that it seeks to facilitate nonprofit ownership of LIHTC projects, the Litigation Penalty applies equally to litigation with nonprofit general partners (such as SHAG) and for-profit general partners (such as HHM).

112.     The Litigation Penalty's willful blindness to which party *succeeds* in litigation gives project sponsors a powerful incentive to threaten and pursue even baseless litigation against investor-owners, armed with the knowledge that the mere act of *filing a lawsuit* will result in the investor being immediately and permanently barred from acquiring LIHTC interests in Washington if the investor does not yield to the sponsor's demands and instead defends itself in court.

113.     In addition to the Litigation Penalty's substantive flaws, the process through which the WSHFC adopted this regulation was rushed, non-transparent, and plagued with irregularities.

114.     On Thursday, August 1, 2019, the WSHFC transmitted notice of the proposed regulation via email to 1,810 undisclosed recipients described in the recipient line of the email as "AMC Newsletter & Multifamily Stakeholders."  Plaintiffs did not receive this notice, and, on information and belief, the proposed regulation was not published on the WSHFC's website prior to its adoption.

115.     The WSHFC required any public comments to be submitted within six business days, and scheduled a public hearing to be held exactly three weeks later, on August 22, 2019.

116.     Although every other WSHFC meeting in 2019 was held in Seattle, the August 22, 2019 meeting to discuss the proposed Litigation Penalty was held more than 160 miles away in Vancouver, Washington.  According to minutes from the August 22, 2019 meeting, the Commission opened the public hearing at 9:32 a.m., and closed the hearing sixteen minutes later.

117.     No participants in Washington's LIHTC program or members of the public spoke at the meeting, and no Commission members debated or even discussed the proposed regulation. Instead, the Commission member proposing the Litigation Penalty provided a short and

COMPLAINT - 30
No.

1  conclusory summary of the proposed rule, after which the WSHFC unanimously adopted it.

2  118.    In fact, the WSHFC did not even bother to post the new rule on its website until

3  Plaintiffs' counsel contacted them on October 15, 2019—nearly three months after the Litigation

4  Penalty was adopted—to inquire as to why the rule change had not been posted on the

5  Commission's website.

6  119.    Plaintiffs did not learn of the new regulation until *after* it was adopted, and well

7  after they engaged in the litigation activity that now bars them from future participation in the

8  LIHTC program in Washington.

9  120.    The Litigation Penalty has a significant, direct, and concrete impact on Plaintiffs.

10  Unless enjoined by this Court, the Litigation Penalty will bar Plaintiffs from making future

11  investments in LIHTC projects in Washington.  Plaintiff AMTAX 260—managed by Plaintiff

12  Alden Torch—was a prevailing defendant in litigation brought by SHAG, yet its mere

13  *involvement* in that litigation—*i.e.*, the fact that it faced and defeated non-meritorious claims—

14  subjects it to exclusion from future participation in Washington's LIHTC program.  Similarly,

15  Plaintiff AMTAX 114 was sued (unsuccessfully) by the sponsor of a project in which it had

16  invested, which would bar it from investing in other LIHTC projects in Washington in the future.

17  **F.    *The WSHFC's ultra vires and legally indefensible "framework" Report***

18  121.    In addition to explicitly changing its regulations to punish investors who enforce

19  or defend their contractual rights in court, the WSHFC also took other steps in an attempt to

20  override the *SHAG* decision and bend the law in favor of general partners and against investor-

21  owners.

22  122.    While *SHAG* was on appeal, the WSHFC began coordinating with a prominent

23  lawyer representing for-profit developers in LIHTC partnership disputes to prepare an *amicus*

24  brief in support of SHAG's appeal.  Although SHAG dismissed its appeal before the WSHFC

25  could file its brief, the WSHFC later transformed its brief into a public policy paper that harshly

26  criticized LIHTC investor-owners and offered what it calls a "clear interpretive framework" for

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

resolving disputes between investors and project sponsors.  *See* Report from the Washington State Housing Finance Commission, *Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing* (Sept. 2019) (the "Report"). Emails obtained through public information requests show that the WSHFC's (now-former) Executive Director was directly involved with the decision to prepare an *amicus* brief supporting SHAG notwithstanding his prior recusal from matters involving SHAG due to his daughter-in-law's employment there.

123.    Although the Report is presented as a general summary of Section 42 and case law related to LIHTC partnership disputes, it in fact offers a profoundly skewed and inaccurate description of the LIHTC program's statutory text, history, purpose, and operations.

124.    The Report harshly criticizes LIHTC investor-owners such as Plaintiffs, referring to them pejoratively as "aggregators" and promoting the false narrative that they are to blame for a perceived increase in LIHTC partnership disputes.

125.    The Report specifically accuses LIHTC investors such as Plaintiffs of "us[ing] burdensome tactics that take advantage of legal ambiguities, resource disparities, and economies of scale to overwhelm their nonprofit counterparties . . . in the shadow of protracted litigation." But the Report supports that false claim by citing cases—including the *SHAG* and *Hidden Hills* litigation described above—where LIHTC investor-owners engaged in litigation only *after they were sued by their LIHTC general partners*, including their for-profit developer partners.

126.    The Report also criticizes recent judicial decisions, including Judge Martinez's ruling in *SHAG*, for recognizing that the below-market ROFR that nonprofits are permitted to hold under Section 42(i)(7) is triggered only if and when the owner is willing to accept a bona fide third-party offer to purchase the property.  In direct contravention of the holding of *SHAG*, the Report suggests that sponsors have a "special privilege" or "right" to unilaterally "obtain eventual ownership of the project at a minimum purchase price."  Report at 1.

127.    But the Report utterly fails to acknowledge—much less grapple with—the

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   history of the LIHTC program, in which Congress expressly rejected a self-triggering below-

2   market purchase option in order to avoid violating the economic substance doctrine.  The

3   Report's selective and revisionist description of the LIHTC program ignores the express

4   legislative compromise at the heart of Section 42(i)(7), in which Congress made a reasoned

5   decision to authorize a below-market ROFR as a compromise between those who favored *no*

6   below-market transfer rights and those who favored a self-triggering below-market purchase

7   option.  Section 42(i)(7) authorizes LIHTC partnership agreements to include a below-market

8   ROFR that a nonprofit can exercise *only* if the property owner receives a bona fide purchase

9   offer that it is willing to accept.  If those preconditions are not satisfied, then the nonprofit cannot

10   exercise its ROFR to obtain the property at a below-market price.  The Commission thus badly

11   misses the mark by treating a transfer of the property to the nonprofit as a foreordained

12   conclusion or a "special privilege" of the general partner.

13       128.    The WSHFC also misleadingly suggests that, "[f]or most of the [LIHTC]

14   program's history, the vast majority of participating nonprofits have secured this transfer right,

15   exercised it, and obtained full ownership to continue the project as low-income housing in

16   accordance with their mission."  The truth is that many LIHTC projects, particularly those in

17   economically distressed areas, do not appreciate in value over the 15-year compliance period.  In

18   those circumstances, LIHTC investors may be willing to transfer ownership to the nonprofit for

19   the Section 42(i)(7) statutory price of debt plus exit taxes.  When a project substantially

20   appreciates in value, however, a nonprofit may not unilaterally eject the investor-owner from the

21   project and capture all of the appreciation for itself.  Any such holding would violate the

22   economic substance doctrine—and, as explained above, would likely result in an

23   unconstitutional taking of the investor's property.

24       129.    The Report is flatly wrong to suggest that investors in LIHTC projects should have

25   no expectation of "profit" beyond federal tax credits.  Indeed, regardless of what any individual

26   LIHTC investor wants, expects, or negotiates, the economic substance doctrine *requires* that all

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    members of a partnership have upside potential and downside risk *apart from any tax benefits* in

2    order to be considered bona fide owners (as opposed to mere lenders).  *See Historic Boardwalk*

3    *Hall*, 694 F.3d at 454-55 (finding that investor was not entitled to federal historic tax preservation

4    credits where it "could never expect to share in any upside" apart from tax benefits); 26 U.S.C. §

5    7701(o)(1).

6        130.    The Report falsely states that LIHTC investors who prevail in partnership

7    disputes will eliminate rent restrictions applicable to the underlying properties.  In fact, LIHTC

8    properties are subject to restrictive covenants that run with the land regardless of any changes in

9    ownership, and extend well beyond the 15-year compliance period in which tax credits are

10   earned.  These restrictions ensure that LIHTC properties will remain affordable regardless of the

11   outcome of individual partnership disputes over ownership.

12       131.    The Report also offers what it calls an "interpretive framework" for resolving

13   ownership disputes that involves a frontal assault on the statutory text and history of the LIHTC

14   program as well as the partnership agreements between investor-owners and general partners.

15   Simply put, the Report urges that whenever there is a dispute or ambiguity over the meaning of

16   Section 42 or a LIHTC partnership agreement, that dispute should be "resolved in favor of

17   nonprofit ownership."  Report at 6-11.

18       132.    But the Commission's whole premise that the LIHTC statute is "ambiguous" or

19   "internally inconsistent" is wrong.  Each of the key terms in Section 42 has a clear and well-

20   defined meaning, and accordingly must be interpreted in light of its plain text rather than the

21   Commission's atextual "framework."  In particular, there is no ambiguity or inconsistency in the

22   meaning of "right of 1st refusal" in Section 42(i)(7).  As discussed above, a ROFR is a property

23   right that has a well-established meaning at common law as a defensive or preemptive purchase

24   right that is triggered only if the property owner intends to accept a bona fide, enforceable third-

25   party offer.  And the legislative history of Section 42(i)(7) eliminates any doubt that Congress

26   made a reasoned, intentional policy choice to authorize a below-market ROFR rather than a

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   unilateral below-market purchase option.

2       133.    The Report also urges courts to interpret Section 42 or LIHTC partnership

3   agreements in light of what the Commission believes to be the policy concerns favoring

4   nonprofit general partners.  But, although the Commission may have some discretion to give

5   preferences to nonprofit ownership in *prospectively* allocating tax credits to new LIHTC

6   projects, the Commission has no authority under federal law to reallocate ownership rights or

7   seek *retroactive* changes to the terms of existing LIHTC partnership agreements.

8       134.    Courts, moreover, have flatly rejected the Commission's argument that statutes

9   should be interpreted based on congressional "purpose" or policy concerns.  The sole role of a

10  court is to interpret a statute or contract as written, not to load the dice or put its thumb on the

11  scale in favor of one type of litigant for purely policy reasons.  Indeed, the Supreme Court held

12  in a unanimous opinion that courts "have no right to play favorites" between the two sides to a

13  dispute and may not "add features [to a statute] that will achieve the statutory 'purposes' more

14  effectively." *Director, Office of Workers Compensation Programs v. Newport News

15  Shipbuilding*, 514 U.S. 122, 136 (1995); *see also Henson v. Santander Consumer USA Inc.*, 137

16  S. Ct. 1718, 1725 (2017) ("[W]e will not presume with petitioners that any result consistent with

17  their account of the statute's overarching goal must be the law but will presume more modestly

18  instead that the legislature says what it means and means what it says.").  After all, "[l]egislation

19  is … the art of compromise," and "the limitations expressed in statutory terms [are] often the

20  price of passage." *See Encino Motorcars, LLC v. Navarro*, 138 S. Ct. 1134, 1142 (2018).  That is

21  precisely the case here, where Congress' use of a ROFR in Section 42(i)(7) reflects a carefully

22  crafted legislative compromise that was designed to balance the important interests at stake.

23      135.    Even if policy concerns were an appropriate consideration in interpreting the

24  Section 42 and LIHTC partnership agreements, which they are not, the Report gets the

25  Congressional policy badly wrong.  The Report is premised on the notion that the ROFR

26  authorized by Section 42(i)(7) is really not a ROFR at all but instead a self-triggering below-

COMPLAINT - 35
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

market purchase option—despite the clear indications in both the text and legislative history that the selection of a ROFR was a reasoned and deliberate policy choice.  The Report simply seeks to retroactively override the policy choices made by Congress.

136.    The Report further asserts that the LIHTC program has the broad purpose of "generating affordable rental housing."  But even if that was a statutory purpose of Section 42, Congress explicitly opted to pursue that goal through an *ownership* model that required LIHTC investors to be true owners of LIHTC properties in order to be eligible for the tax credits generated by those properties.  The Report would upend that careful balance by effectively granting general partners a Washington state-law self-triggering below-market purchase option that would strip the investors of any meaningful economic substance aside from the tax benefits. The Commission's misguided attempt to retroactively reallocate ownership rights in LIHTC partnerships would also undermine new investments by reducing the availability and raising the cost of capital when investors inevitably insist on more favorable terms given the uncertainty caused by the Commission's *ultra vires* interference with contract rights.

137.    At bottom, the WSHFC's Report merely regurgitates the talking points and op-eds of general partners and their counsel, including the lawyer with whom WSHFC previously collaborated on its *amicus* brief in the *SHAG* litigation.  Though it did not ultimately name Alden Torch in the final published version of the report, the WSHFC initially identified Alden Torch and three other investment management firms by name in draft versions, which strongly suggests that the WSHFC was specifically targeting Plaintiffs in adopting the Litigation Penalty and issuing the Report.

138.    In October 2019, the WSHFC hosted a public panel at its annual housing conference in Seattle to discuss the issues addressed in the Report.  The panel consisted of the Commission's outside counsel and the lawyer who collaborated with the WSHFC in connection with the preparation of its *amicus* brief in the *SHAG* litigation.  A WSHFC representative

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    moderated the panel, but the Commission did not invite anyone representing the investor

2    perspective to participate.

3            139.    During the Commission-sponsored panel discussion, the for-profit developers'

4    counsel said of LIHTC investors, "relationships don't matter to these folks."  The WSHFC

5    representative, moreover, told the audience that the Commission intended the new Litigation

6    Penalty to work as an "assist" to the development community, and responded to an audience

7    member's comment that investors might challenge the regulation in court by saying: "Bring it

8    on."

9            140.    The facts alleged above confirm that, like the Litigation Penalty, the publication

10   of the Report and the promotion of the flawed arguments included therein are *ultra vires* actions

11   directed specifically at reversing the outcome of *SHAG* and ensuring that LIHTC general

12   partners achieve by other means what they failed to accomplish in court.

13           141.    Given the Commission's *ultra vires* actions and gross abuses of power, it would

14   be appropriate for the IRS to initiate an audit of the Commission and to take all steps that are

15   needed to bring it back within its properly limited role.

16   G.      **The WSHFC's proposed revisions to the Litigation Penalty only compound its**

17           **constitutional deficiencies**

18           142.    On September 4, 2020, the WSHFC sent an email to stakeholders that had signed

19   up to its distribution list seeking "comments by Sept[ember] 16 on proposed changes to policies

20   and criteria for 2021 and beyond[.]"  The last of the WSHFC's nine proposed changes related to

21   the Litigation Penalty.

22           143.    As alleged above, the current version of the Litigation Penalty categorically and

23   permanently bars any LIHTC investors who have engaged in litigation with a general partner

24   from participating in a new LIHTC investment or purchasing a limited partner interest in an

25   existing LIHTC partnership, regardless of the outcome of the litigation or the merits of the

26   investors' position.

COMPLAINT - 37
No.

144.    Under the proposed modification to the Litigation Penalty, the WSHFC would retain discretion to make exceptions to that rule if the investor shows to the Commission's satisfaction that "(1) each claim filed against it was no fault of the [investor] and (2) the [investor] has consistently acted in furtherance of the Low Income Tax Credit Program's goals, including the preservation of projects at low-income housing for the longest periods and, to the extent applicable, the continuing material participation of nonprofit housing organizations."

145.    This proposed revision would not cure the Litigation Penalty's constitutional infirmities, particularly given the WSHFC's clearly stated view that *any* litigation that challenges a nonprofit general partner's attempt to exercise a Section 42(i)(7) ROFR does not further the goal of "continuing material participation of nonprofit housing organizations."

146.    Instead, this change to the Litigation Penalty would only compound its constitutional deficiencies.  Because the Commission has no authority at all to promulgate rules that retroactively reallocate ownership rights in LIHTC partnerships agreements, the revised version of the Litigation Penalty is every bit as *ultra vires* as the original.  The Commission also lacks any authority to impose new burdens on LIHTC limited partners by forcing them to document and justify their litigation conduct to the Commission's satisfaction.  And the revisions to the Litigation Penalty would also violate foundational separation of powers principles by purporting to give the Commission authority to second guess the courts and pass its own judgment on investors' litigation conduct.

147.    It is up to the courts, not the WSHFC, to adjudicate the merits of any litigation involving LIHTC ownership interests, and any policy that gives the Commission discretion to punish an investor based on good-faith, non-frivolous litigation conduct violates separation of powers principles in addition to the constitutional doctrines discussed below in Counts I through V.  *See*, *e.g. Stern v. Marshall*, 564 U.S. 462, 483 (2011) ("In establishing the system of divided power in the Constitution, the Framers considered it essential that 'the judiciary remain[ ] truly distinct from both the legislature and the executive.'"); *State v. Wadsworth*, 139 Wn.2d 724, 735,

COMPLAINT - 38
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

991 P.2d 80 (2000) (en banc)  ("[T]his court relies on federal principles regarding the separation of powers doctrine in interpreting and applying the state's separation of powers doctrine....") (quoting *State v. Blilie*, 132 Wash.2d 484, 489, 939 P.2d 691 (1997)).

148.    The concern that the Commission will use its authority to usurp the role of the courts, moreover, is not simply theoretical, as the WSHFC has engaged in a deliberate and concerted effort—through both the Litigation Penalty and the Report—to reverse the outcome of a specific individual lawsuit (*i.e., SHAG*).

149.    After receiving comments critical of its proposed modification to the Litigation Penalty, the WSHFC circulated an updated version of the proposed change on October 8, 2020. *See* January 2021 Bond/Tax Credit Proposed Policy Changes, *available at* https://bit.ly/3eg2dTD.  While the updated version places additional obligations on a proposed limited partner transferee to identify and justify any past litigation conduct, it continues to empower the Commission to decide whether that litigation conduct "was no fault of the Transferee's and that the Transferee has consistently acted in furtherance of the Low Income Housing Tax Credit Program's goals, including the preservation of projects as low-income housing for the longest periods and, to the extent applicable, the continuing material participation of nonprofit housing organizations."

150.    This new proposed iteration of the Litigation Penalty accordingly suffers from all of the same constitutional deficiencies discussed below.  Plaintiffs reserve the right to amend this complaint to assert additional claims, including claims based on violation of constitutional separation of powers principles, in the event that the Litigation Penalty is modified during the pendency of this action.

### H.    The WSHFC's attacks on investors will impair private investments that are critical to the success of the LIHTC program

151.    The WSHFC's campaign to punish LIHTC investors and blame them for the continuing shortage and lack of preservation of affordable housing ignores the critical

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

importance of private capital investment to the success of the LIHTC program and its effectiveness in increasing the availability of low-income units.  The Commission's arbitrary rules and unconstitutional attempts to retroactively reallocate ownership rights in LIHTC partnerships will increase uncertainty for investors about the security of their ownership rights, thereby reducing the availability and raising the cost of capital for LIHTC projects.

152.    This attack is particularly damaging to the LIHTC program and the affordable housing industry at a time when the value of tax credits in reducing overall tax liability has decreased following Congress' passage of the Tax Cuts and Jobs Act of 2017, which substantially reduced the tax burden of corporations and other institutional investors.

153.    The WSHFC has identified no credible evidence to support the assertion that LIHTC investor-owners have acted improperly or in a manner injurious to affordable housing. In fact, LIHTC investors' *success* in multiple recent cases where they were sued by general partners refutes any suggestion that the investors were acting unlawfully or improperly. The WSHFC has also failed to demonstrate that the Litigation Penalty will serve the stated objective of curbing litigation, much less the Commission's ultimate mandate to "assist in making affordable and decent housing available throughout the state."

154.    By publicly taking the side of developers and sponsors at the expense of investor-owners like Plaintiffs, the WSHFC has strayed far beyond its delegated authority to allocate LIHTC credits in Washington; has inserted itself into disputes that are fundamentally matters of private contract interpretation; has failed to meet its ultimate obligation to foster the continued development and maintenance of affordable housing in the state of Washington; and has exceeded multiple statutory and constitutional limitations.

## FIRST CAUSE OF ACTION

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### (VIOLATION OF FIRST AMENDMENT – RIGHT TO PETITION)

155.    Paragraphs 1-154 are incorporated by reference as if set forth in full herein.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone: 206.359.8000
Fax:  206.359.9000

156.     The First Amendment, which applies to the states via the Fourteenth Amendment, provides, in relevant part, that "Congress shall make no law . . . abridging . . . the right of the people . . . to petition the Government for a redress of grievances."  U.S. Const. amend. I; *see also Hague v. Comm. for Indust. Org.*, 307 U.S. 496, 519-20 (1939).  The "right to petition [i]s one of 'the most precious of the liberties safeguarded by the Bill of Rights'" and "is implied by 'the very idea of a government [that is] republican in form.'"  *BE & K Const. Co. v. N.L.R.B.*, 536 U.S. 516, 524-525 (2002) (citing *United States v. Cruikshank*, 92 U. S. 542, 552 (1876)).

157.     The right to petition extends to all branches of the government and includes the specific right to access and litigate in the courts.  *Cal. Motor Transp. Co. v. Trucking Unltd.*, 404 U.S. 508, 510–11 (1972); *see also Ringgold-Lockhart v. Cty. of LA*, 761 F.3d 1057, 1061 (9th Cir. 2014).

158.     The government may not burden the fundamental right to petition unless the litigation conduct at issue is "objectively baseless *and* subjectively motivated by an unlawful purpose."  *BE & K Const.*, 536 U.S. at 531 (emphasis in original).

159.     Plaintiffs' litigation activities fall squarely within the protection of the First Amendment to the extent Plaintiffs participate in judicial proceedings in order to assert and defend their contract and property rights.

160.     Plaintiffs' litigation activities in cases like *SHAG* and *Hidden Hills* were not baseless, unlawfully motivated, or a sham.  Indeed, Plaintiffs *successfully defended themselves* in both cases after being sued by LIHTC general partners.

161.     The Litigation Penalty sanctions Plaintiffs for their constitutionally protected litigation conduct.  The WSHFC's new regulation uses Plaintiffs' mere involvement in litigation against general partners to immediately and permanently bar Plaintiffs from acquiring any further interests in LIHTC projects in Washington

162.     Moreover, the Litigation Penalty's treatment of mere involvement in a prior lawsuit as *per se* "illegal 'is a burden by itself,' because various legal consequences flow from

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    such a finding and because such a finding 'poses the threat of reputational harm that is different

2    and additional to any burden posed by other penalties.'" *Sosa v. DIRECTV, Inc.*, 437 F.3d 923,

3    930 (9th Cir. 2006) (quoting *BE & K*, 536 U.S. at 530).

4         163.    The Litigation Penalty cannot be construed in a manner to avoid burdening

5    investor-owners' right to petition. Indeed, the penalty is specifically designed to punish *any* prior

6    participation by an investor in a lawsuit with a sponsor general partner over project ownership,

7    regardless of the reasonableness, success, motive, or origin of the litigation.

8         164.    The Litigation Penalty thus violates Plaintiffs' First Amendment right to petition,

9    by penalizing Plaintiffs for engaging in litigation and by placing unconstitutional conditions on

10   Plaintiffs' ability to participate in the federal LIHTC program in Washington.  *See, e.g.,*

11   *Thompson v. W. States Med. Ctr.*, 535 U.S. 357 (2002) (government could not condition

12   exemption from FDA approval process on drug providers' willingness to surrender their First

13   Amendment right to advertise their products); *U.S. v. Scott*, 450 F.3d 863, 866 (9th Cir. 2006)

14   ("The 'unconstitutional conditions' doctrine limits the government's ability to exact waivers of rights

15   as a condition of benefits, even when those benefits are *fully discretionary*.") (emphasis added).

16        165.    Plaintiffs have been and continue to be injured as a result of the Commission's

17   adoption and enforcement of the Litigation Penalty.  Because Plaintiffs were parties to past

18   litigation with LIHTC project sponsors, they will be barred from making future investments in

19   LIHTC projects in Washington.  Moreover, Plaintiff Alden Torch owns or manages limited

20   partner interests in six other LIHTC projects in Washington, and they will face sanctions under

21   the Litigation Penalty if they assert or defend their rights under those partnership agreements.

22        166.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare

23   the rights of interested parties in a case of actual controversy within the Court's jurisdiction.

24        167.    A real and actual controversy has developed between Plaintiffs and the WSHFC

25   concerning the constitutionality of the WSHFC's adoption and enforcement of the Litigation

26   Penalty.

COMPLAINT - 42
No.

168.    Plaintiffs are accordingly entitled to a judgment declaring that the WSHFC's Litigation Penalty violates the First Amendment right to petition.

169.    Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against state actors who are violating, or planning to violate, federal law may proceed in equity.  The *Ex Parte Young* doctrine empowers federal courts to enjoin state actors from violating federal law, but requires that the individual WSHFC members be named as defendants.

170.    The WSHFC is a state actor.

171.    Plaintiffs are accordingly entitled to an injunction prohibiting the WSHFC or any of its members, employees, or agents from enforcing the Litigation Penalty because it violates the First Amendment right to petition.

## SECOND CAUSE OF ACTION

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### (VIOLATION OF CONTRACTS CLAUSE)

172.    Paragraphs 1-154 are incorporated by reference as if set forth in full herein.

173.    Under the Contracts Clause of the United States Constitution, "[n]o state shall . . . pass any . . . Law impairing the Obligations of Contracts."  U.S. Const. art. I, § 10, cl. 1.

174.    In determining whether a law or regulation violates the Contracts Clause, "[t]he threshold inquiry is 'whether the state law has, in fact, operated as a substantial impairment of a contractual relationship.'"  *Energy Reserves Group, Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 411 (1983) (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)).

175.    This threshold inquiry directs courts to consider if a state law "thwarts performance of an essential term."  *S. California Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003).  It is well settled that state laws "thwart[] performance," *id.*, when they make "the [contractual] remedy a shadow" of its former self.  *W.B. Worthen Co. ex rel. Bd. of Com'rs of Street Imp. Dist. No. 513 of Little Rock, Ark. v. Kavanaugh*, 295 U.S. 56, 62 (1935) (striking

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1  down Arkansas law that incentivized contractual breach by retroactively limiting the non-
2  breaching party's remedies).

3      176.    The WSHFC's Litigation Penalty directly and substantially impairs the
4  contractual relationships between LIHTC investors and general partners because it applies to
5  existing LIHTC partnership agreements and severely undermines investors' ability to safeguard
6  their contractual rights under those agreements.  A core aspect of any contractual agreement is
7  the ability of either party to seek remedies for breach.  Yet the WSHFC's Litigation Penalty
8  penalizes any investor involved in litigation over a LIHTC agreement, whether as plaintiff or
9  defendant and without regard to the merits of the investor's position.

10      177.    Indeed, the Litigation Penalty effectively allows LIHTC general partners to
11  breach their partnership agreements with impunity, safe in the knowledge that any effort by
12  investors to protect their rights in court will automatically blacklist them from future
13  participation in Washington's LIHTC program.

14      178.    Where, as here, the government's regulation substantially impairs a contractual
15  relationship, the court must consider whether "the State, in justification, [has] a significant and
16  legitimate public purpose behind the regulation" or is instead merely "providing a benefit to special
17  interests." *Energy Reserves Grp.,* 459 U.S. at 411-12; *accord Allied Structural Steel*, 438 U.S. at
18  249.

19      179.    The WSHFC's Litigation Penalty was not a legitimate exercise of governmental
20  police power to remedy a general social or economic problem, but instead improperly provided a
21  benefit to certain special interests—*i.e.,* LIHTC general partners—who had lobbied the Commission
22  to adopt this misguided and unlawful rule.

23      180.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare
24  the rights of interested parties in a case of actual controversy within the Court's jurisdiction.

25      181.    A real and actual controversy has developed between Plaintiffs and the WSHFC
26  concerning the constitutionality of the WSHFC's adoption and enforcement of the Litigation

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    Penalty.

2        182.    Plaintiffs are accordingly entitled to a judgment declaring that the Litigation

3    Penalty violates the Contracts Clause.

4        183.    Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against state

5    actors who are violating, or planning to violate, federal law may proceed in equity.  The *Ex Parte*

6    *Young* doctrine empowers federal courts to enjoin state actors from violating federal law, but

7    requires that the individual WSHFC members be named as defendants.

8        184.    The WSHFC is a state actor.

9        185.    Plaintiffs are accordingly entitled to an injunction prohibiting the WSHFC or any

10   of its members, employees, or agents from enforcing the Litigation Penalty because it violates

11   the Contracts Clause.

12                          **THIRD CAUSE OF ACTION**

13               **DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF**

14            **(VIOLATION OF FOURTEENTH AMENDMENT – DUE PROCESS)**

15       186.    Paragraphs 1-154 are incorporated by reference as if set forth in full herein.

16       187.    The Due Process Clause of the Fourteenth Amendment prohibits states from

17
     depriving any person of life, liberty, or property, without due process of law.  *See* U.S. Const.
18
19   amend. XIV, § 1.

20       188.    The Due Process Clause has both procedural and substantive components, which

21   function to safeguard fundamental liberty interests like the right of access to the courts, and also

22   mandate that certain procedures be followed before the government deprives someone of such an

23   interest.  *See Washington v. Glucksberg*, 521 U.S. 702, 719–20 (1997) ("The Due Process Clause

24   guarantees more than fair process . . . [it] also provides heightened protection against

25   government interference with certain fundamental rights and liberty interests.").

26       189.    Procedural due process encompasses the "fundamental principle in our legal

COMPLAINT - 45
No.

1   system [] that laws which regulate persons or entities must give fair notice of conduct that is

2   forbidden or required." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).  As a

3   result, a law violates due process if it does not provide "person[s] of ordinary intelligence fair

4   notice of what is prohibited." *Id.* at 254.

5       190.   The Litigation Penalty violates procedural due process because it broadly

6   penalizes LIHTC investors for any kind of litigation conduct against general partners—even

7   defensive and/or meritorious litigation—which deprives investors like Plaintiffs of the ability to

8   adapt their conduct to avoid being penalized.

9       191.   The Due Process Clause also protects against impermissibly retroactive laws.

10  Retroactive legislation "presents problems of unfairness that are more serious than those posed

11  by prospective legislation, because it can deprive citizens of legitimate expectations and upset

12  settled transactions." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 191 (1992).  The Due Process

13  Clause gives effect to the law's general distrust of retroactive laws by "protect[ing] the interests

14  in fair notice and repose that may be compromised by retroactive legislation." *Landgraf v. USI*

15  *Film Prods.*, 511 U.S. 244, 266 (1994).

16      192.   In determining whether legislation operates retroactively, the Supreme Court has

17  drawn on an "influential definition" offered by Justice Story in 1814.  *Id.* at 268.  Under that

18  definition, a statute is retroactive if it "takes away or impairs vested rights acquired under

19  existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, *in*

20  *respect to transactions or considerations already past.*"  *Id.* at 269 (emphasis added).  In short,

21  "the court must ask whether the new provision attaches new legal consequences to events

22  completed before its enactment."  *Id.* at 269-70.  "The retrospective aspects of [economic]

23  legislation, as well as the prospective aspects, must meet the test of due process, and the

24  justifications for the latter may not suffice for the former."  *Eastern Enterprises*, 524 U.S. at 548

25  (Kennedy, J.).

26      193.   The Litigation Penalty violates the Due Process Clause because its retroactive

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

application to existing LIHTC partnership agreements destroys vested contractual and property

rights and imposes new burdens on completed transactions that were entered into years ago. The

signatories to LIHTC partnership agreements had no conceivable reason to believe when they

signed those contracts that they might lose their ability to assert or defend their rights in court.

The Litigation Penalty thus entails an unconstitutional retroactive stripping of Plaintiffs'

"substantive rights, liabilities, or duties." *Landgraf*, 511 U.S. at 278.

194.    The Litigation Penalty is also unconstitutionally retroactive because it imposes

new sanctions based on past litigation conduct. At the time the Commission adopted the

Litigation Penalty in August 2019, Plaintiffs had *already* faced litigation brought by general

partners over project ownership. Thus, even if the Litigation Penalty were an otherwise-valid

policy option—which it is not—it punishes Plaintiffs for their *past* conduct even though they had

no notice that their litigation conduct could result in them being disqualified from participation in

future LIHTC projects in Washington.

195.    Because Plaintiffs and other LIHTC investors could not have known when they

defended themselves in court against claims brought by general partners that their litigation

conduct would result in severe sanctions by the WSHFC, they have been deprived of fair notice

and subject to unconstitutionally retroactive legislation, in violation of procedural due process.

196.    Finally, under the *substantive* due process component of the Fourteenth

Amendment, if a law or regulation burdens a fundamental liberty interest, the law or regulation

can be upheld only if the government can justify it under strict scrutiny. *See Glucksberg*, 521

U.S. at 721. To survive strict scrutiny, the government must demonstrate that the law or

regulation is "narrowly tailored to serve a compelling [government] interest." *Id.*

197.    By penalizing LIHTC investors like Plaintiffs for their involvement in litigation

with LIHTC developers, the WSHFC's Litigation Penalty infringes the fundamental liberty

interest of investors to petition the government for redress of grievances, in violation of

substantive due process. *See Ringgold-Lockhart*, 761 F.3d at 1061 ("[T]he right of access to the

COMPLAINT - 47
No.

Perkins Coie LLP
1201 Third Ave, Suite 4900
Seattle, WA 98101-3099
Phone: 206.359.8000
Fax: 206.359.9000

courts is a fundamental right protected by the Constitution."); *see also BE & K*, 536 U.S. at 524–25 (describing right to petition as "one of the most precious of the liberties safeguarded by the Bill of Rights").

198.     The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare the rights of interested parties in a case of actual controversy within the Court's jurisdiction.

199.     A real and actual controversy has developed between Plaintiffs and the WSHFC concerning the constitutionality of the WSHFC's adoption and enforcement of the Litigation Penalty.

200.     Plaintiffs are accordingly entitled to a judgment declaring that the Litigation Penalty violates the Due Process Clause.

201.     Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against state actors who are violating, or planning to violate, federal law may proceed in equity.  The *Ex Parte Young* doctrine empowers federal courts to enjoin state actors from violating federal law, but requires that the individual WSHFC members be named as defendants.

202.     The WSHFC is a state actor.

203.     Plaintiffs are accordingly entitled to an injunction prohibiting the WSHFC or any of its members, employees, or agents from enforcing the Litigation Penalty because it violates the Due Process Clause.

## FOURTH CAUSE OF ACTION

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### (VIOLATION OF SUPREMACY CLAUSE)

204.     Paragraphs 1-154 are incorporated by reference as if set forth in full herein.

205.     The Supremacy Clause states, in relevant part, that "the Laws of the United States … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  *See* U.S. Const. art. VI., cl. 2.

206.     State laws are preempted under the Supremacy Clause if they would "stands as an

COMPLAINT - 48
No.

1   obstacle to the accomplishment and execution of the full purposes and objectives of Congress—

2   whether that 'obstacle' goes by the name of 'conflicting; contrary to; … repugnance; difference;

3   irreconcilability; inconsistency; violation; curtailment; … interference,' or the like." *Geier v. Am.*

4   *Honda Motor Co.*, 529 U.S. 861, 873 (2000).  A state law is preempted if it prevents or frustrates

5   the accomplishment of a federal objective.  *Id.*

6       207.   As evidenced by the Report, the Litigation Penalty conflicts with, and would

7   undermine the purposes and objectives of, the federal LIHTC program.

8       208.   It has long been recognized that there is a severe shortage of affordable housing in

9   the United States.  To incentivize the development and maintenance of affordable housing,

10  Congress enacted the LIHTC program to attract private investment to this sector.  The Litigation

11  Penalty poses a direct obstacle to this program by barring investors from projects in Washington

12  if they have ever been party to litigation with a LIHTC general partner.  That is, while Congress

13  created the LIHTC program to *attract* investment in affordable housing, the Litigation Penalty will

14  be used to *block* involvement in that program by otherwise-qualified investors.  The WSHFC's

15  actions thus pose a direct and substantial obstacle to the achievement of the full purposes of federal

16  law.

17      209.   The Litigation Penalty is also contrary to, and therefore preempted by, federal law

18  because it is *ultra vires*.   Under the LIHTC program, state commissions have carefully

19  circumscribed authority to prospectively allocate tax credits and monitor compliance with program

20  requirements.  In prospectively allocating tax credits to new projects, state commissions have some

21  discretion to take into account considerations such as nonprofit involvement and the length of the

22  affordability period.

23      210.   But absolutely nothing in the relevant statutes or regulations delegates to state

24  commissions authority to interpret partnership agreements or reallocate contractual rights between

25  investors and nonprofits.  Those questions are addressed solely by Section 42 and the terms of the

26  partnership agreements, and state commissions have zero authority over these matters.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

211.    Moreover, although state housing finance commissions have authority to allocate tax credits and ensure that a project's *operations* comply with LIHTC program requirements, state commissions have no authority under federal law to dictate the terms under which limited partner *investor* interests may be transferred.   Indeed, nothing in Section 42 or any accompanying regulations grants the WSHFC authority to interpret, restrict, or reallocate private contractual rights in a LIHTC partnership.

212.    The express purpose of the Litigation Penalty is neither to allocate credits nor to monitor compliance.  Viewed in the context of the general partners' lobbying efforts at the federal and state levels, including to the WSHFC, the purpose of the Litigation Penalty is plainly to reverse the outcome of the *SHAG* litigation in abrogation of the purposes and plain language of Section 42(i)(7).

213.    With the Litigation Penalty in effect, when LIHTC partners engage in litigation over attempts by nonprofits to exercise their below-market ROFR unilaterally—or any other issue, for that matter—regardless of who initiates or succeeds, only the investor partner is permanently and categorically barred from future participation in the LIHTC program.

214.    The Litigation Penalty's effect is clear:  There will be one standard for Washington—where investor partners will be subject to below-market options created and enforced by the Commission—and another standard for the rest of the country—where the below-market ROFR that Congress intended when it passed Section 42(i)(7) will continue to be enforced according to its terms.

215.    The Litigation Penalty imposes a differing governing standard in Washington and would frustrate the purpose of Section 42.  Thus, the Litigation Penalty directly conflicts with Section 42, stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress in enacting Section 42, and is preempted.

216.    The WSHFC seeks to push a policy agenda using the wrong means.  The practical effect of Litigation Penalty will be the transformation of a defensive below-market ROFR into a

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

self-triggering below-market option.  But any such change must be accomplished by comprehensive tax legislation enacted by Congress, and any legislation that retroactively converts property rights would, in the absence of just compensation, violate the Takings Clause of the Fifth Amendment to the United States Constitution.  *See Stop the Beach Renourishment*, 560 U.S. at 715.

217.    For all these reasons, the Litigation Penalty violates the Supremacy Clause of the United States Constitution and is accordingly preempted.

218.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare the rights of interested parties in a case of actual controversy within the Court's jurisdiction.

219.    A real and actual controversy has developed between Plaintiffs and the WSHFC concerning the constitutionality of the WSHFC's adoption and enforcement of the Litigation Penalty.

220.    Plaintiffs are accordingly entitled to a judgment declaring that the Litigation Penalty violates the Supremacy Clause and is preempted by federal law.

221.    Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against state actors who are violating, or planning to violate, federal law may proceed in equity.  The *Ex Parte Young* doctrine empowers federal courts to enjoin state actors from violating federal law, but requires that the individual WSHFC members be named as defendants.

222.    The WSHFC is a state actor.

223.    Plaintiffs are accordingly entitled to an injunction prohibiting the WSHFC or any of its members, employees, or agents from enforcing the Litigation Penalty or from adopting any other rule or regulation or engaging in any conduct that would penalize LIHTC investor-owners based on the interpretation of the LIHTC program set forth in the Report.

## FIFTH CAUSE OF ACTION

### DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

### (VIOLATION OF FOURTEENTH AMENDMENT – EQUAL PROTECTION)

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1    224.   Paragraphs 1-154 are incorporated by reference as if set forth in full herein.

2    225.   The Equal Protection Clause of the Fourteenth Amendment prohibits states from

3  denying any person the equal protection of the laws. *See* U.S. Const. amend. XIV, § 1; *see also*

4  *Santa Clara Cty v. Southern Pacific R. Co.*, 118 U.S. 394 (1886) (Equal Protection Clause

5  applies to corporations).

6    226.   The Litigation Penalty singles out and treats LIHTC investors differently from

7  other participants in Washington's LIHTC program, including, in particular, LIHTC general

8  partners, based on their petitioning conduct.

9    227.   Under the Equal Protection Clause, if a law or regulation burdens a fundamental

10  right to some groups but not others, the law or regulation can be upheld only if the government

11  can justify it under strict scrutiny. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1,

12  17 (1973). To survive strict scrutiny, the government must demonstrate that the law or regulation

13  is "'narrowly tailored' to serve a 'compelling' government interest." *See e.g., Parents Involved in*

14  *Cmty. Schs. v. Seattle Sch. Dist.*, 551 U.S. 701, 720 (2007) (quoting *Adarand Constructors, Inc.*

15  *v. Pena*, 515 U.S. 200, 227 (1995)).

16    228.   By singling out LIHTC investor-owners like Plaintiffs and penalizing them for

17  their involvement in litigation with their general partners, the Litigation Penalty treats LIHTC

18  investors differently than LIHTC general partners and does so in a way that infringes investors'

19  fundamental right of access to the courts. *See Ringgold-Lockhart*, 761 F.3d at 1061 ("[T]he right

20  of access to the courts is a fundamental right protected by the Constitution."); *see also BE & K*,

21  536 U.S. at 524– 25 (describing right to petition as "one of the most precious of the liberties

22  safeguarded by the Bill of Rights").

23    229.   The Litigation Penalty is thus subject to strict scrutiny, and the WSHFC must

24  demonstrate that it is narrowly tailored to achieve a compelling government interest. *See e.g.,*

25  *Parents Involved*, 551 U.S. at 720.

26    230.   The Litigation Penalty cannot survive strict scrutiny.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

231.    The WSHFC's stated purpose for adopting the Litigation Penalty—*i.e.*, to "deter investor members from entering a partnership for the sole purpose of extracting additional value from the year 15 exit and then flipping the project for additional profit"—does not constitute a compelling government interest.  To the contrary, that regulatory goal merely reflects the WSHFC's *ultra vires* attempt to override the economic substance doctrine and coerce LIHTC investors to abandon their ownership rights to the general partners at the end of the 15-year compliance period.

232.    The Litigation Penalty is also not narrowly tailored because it targets far more conduct than is necessary to achieve the Commission's purported goals.  Even assuming—contrary to fact—that there were some evidence of investors abusing the litigation process, the Penalty is not narrowly tailored because it disqualifies investors from future projects based on their participation in *any* litigation with general partners, not just litigation where investors advanced baseless or bad-faith claims.

233.    Even if the Litigation Penalty is not subject to strict scrutiny under the Equal Protection Clause, it must still pass rational basis review.  That standard is deferential but is not a blank check.  Courts have found laws to violate the rational basis test when, for example, they are "wholly without any rational basis," *USDA v. Moreno*, 413 U.S. 528, 538 (1973), or they are merely based on "a bare desire to harm a politically unpopular group," *In re Levenson*, 560 F.3d 1145, 1150 (9th Cir. 2009); *see also City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432 (1985).

234.    The Litigation Penalty fails rational basis review.  There is no conceivable rational basis on which to punish investors (like Plaintiffs) who were sued by LIHTC general partners and then *prevailed* in court.  Under the Litigation Penalty, a general partner that brings frivolous claims against an investor and loses remains free to participate in projects in Washington, but an investor that successfully defends itself against those frivolous claims is permanently barred from the program.  The only conceivable basis for this law is "a bare desire

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

1   to harm a politically unpopular group," *Levenson*, 560 F.3d at 1150, which is never a rational

2   basis for government action.

3       235.    For all these reasons, the Litigation Penalty violates the Equal Protection Clause.

4       236.    The Declaratory Judgment Act, 28 U.S.C. § 2201, authorizes this Court to declare

5   the rights of interested parties in a case of actual controversy within the Court's jurisdiction.

6       237.    A real and actual controversy has developed between Plaintiffs and the WSHFC

7   concerning the constitutionality of the WSHFC's adoption and enforcement of the Litigation

8   Penalty.

9       238.    Plaintiffs are accordingly entitled to a judgment declaring that the Litigation

10  Penalty violates the Equal Protection Clause.

11      239.    Under *Ex Parte Young*, 209 U.S. 123 (1908), and its progeny, suits against state

12  actors who are violating, or planning to violate, federal law may proceed in equity.  The *Ex Parte*

13  *Young* doctrine empowers federal courts to enjoin state actors from violating federal law, but

14  requires that the individual WSHFC members be named as defendants.

15      240.    The WSHFC is a state actor.

16      241.    Plaintiffs are accordingly entitled to an injunction prohibiting the WSHFC or any

17  of its members, employees, or agents from enforcing the Litigation Penalty because it violates the

18  Equal Protection Clause.

19

20  ## PRAYER FOR RELIEF

21      WHEREFORE, Plaintiffs respectfully request relief as follows:

22      A.    An order and judgment declaring that the WSHFC's Litigation Penalty violates

23  the First Amendment to the United States Constitution;

24      B.    An order and judgment declaring that the WSHFC's Litigation Penalty violates

25  the Contracts Clause of the United States Constitution;

26      C.    An order and judgment declaring that the WSHFC's Litigation Penalty violates

COMPLAINT - 54
No.

the Due Process Clause of the Fourteenth Amendment to the United States Constitution;

D.      An order and judgment declaring that the WSHFC's Litigation Penalty violates the Supremacy Clause of the United States Constitution and is preempted by federal law;

E.      An order and judgment declaring that the WSHFC's Litigation Penalty violates the Equal Protection Clause of the United States Constitution;

F.      An injunction prohibiting the WSHFC or any of its members, employees, or agents from enforcing the Litigation Penalty;

G.      An injunction prohibiting the WSHFC or any of its members, employees, or agents from adopting any other rule or regulation or engaging in any conduct that would penalize LIHTC investor-owners based on the interpretation of the LIHTC program set forth in the Report; and

H.      Such other and further relief as this Court may deem just and proper, including reasonable attorneys' fees and the costs of this action.

RESPECTFULLY SUBMITTED this 17th day of November, 2020.

**Perkins Coie LLP**

By:   /s/ Tiffany L. Lee
       /s/ David J. Burman
David J. Burman, WSBA #10611
Tiffany L. Lee, WSBA #51979
1201 Third Avenue, Suite 4900
Seattle, WA  98101-3099
Telephone:  206.359.8000
Facsimile:  206.359.9000
Email:  DBurman@perkinscoie.com
         TiffanyLee@perkinscoie.com

**King & Spalding LLP**

Eric S. Pettit
       (*pro hac vice* application forthcoming)
Michael D. Roth
       (*pro hac vice* application forthcoming)
Laura Lively Babashoff
       (*pro hac vice* application forthcoming)
633 West Fifth Street, Suite 1600
Los Angeles, CA 90071
Telephone:  213 443 4355
Facsimile:  213 443 4310
Email:  epettit@kslaw.com
         mroth@kslaw.com
         llively@kslaw.com

Attorneys for Plaintiffs

COMPLAINT - 55
No.

**Perkins Coie LLP**
1201 Third Ave, Suite 4900
Seattle, WA  98101-3099
Phone:  206.359.8000
Fax:  206.359.9000

# EXHIBIT A

# Exhibit A

# Chronological Summary of Key Events

| Date | Event |
| --- | --- |
| 02/19/19 | Chief Judge Ricardo Martinez of the United States District Court for the Western District of Washington issues order in the *SHAG Litigation* concluding that SHAG's Section 42(i)(7) ROFR requires it "to meet the ordinary definition of a right of first refusal (in addition to its other requirements)[.]"  (*Id.* ¶ 73.) |
| 03/29/19 | Judge Martinez issues order following bench trial finding that SHAG's Section 42(i)(7) ROFR was neither triggered nor validly exercised in connection with any of the seven properties, and that SHAG "engaged in inequitable, bad faith, and unjust conduct when it secretly colluded . . . to procure sham offers from straw buyers" for the projects in question.  (*Id.* ¶ 77.) |
| 06/04/19 | United States Senator Maria Cantwell, D-WA, introduces Senate Bill 1703, the Affordable Housing Credit Improvement Act of 2019, which includes a provision—Section 303—that purports to retroactively redefine the below-market ROFR permitted by Section 42(i)(7) such that, like an option, it can be exercised unilaterally and without owner consent.  (*Id.* ¶¶ 89.) |
| 08/01/19 | WSHFC transmits notice of its proposed Transfer Rule to 1,810 "AMC Newsletter & Multifamily Stakeholders."  (*Id.* ¶ 114.)  The Transfer Rule states that the WSHFC "will consent to a proposed Property Transfer or Assignment only if it is determined that" among other things, "[t]he Transferee has not engaged in litigation concerning a sponsor's ownership interest after the initial term of the partnership (year-15-exit)."  (*Id.* ¶ 103.) |
| 08/09/19 | WSHFC closes the public comment period for the Transfer Rule (*Id.* ¶ 115.) |
| 08/22/19 | WSHFC adopts the Transfer Rule at a meeting in Vancouver, Washington after a public hearing that lasted sixteen minutes and included no debate or public discussion (*Id.* ¶¶ 116-17.) |

| Date | Event |
|------|-------|
| 09/13/19 | WSHFC self-publishes report entitled "Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing," which originated as an *amicus* brief supporting an appeal of the outcome of the *SHAG Litigation* that SHAG filed but later dismissed.  (*Id.* ¶ 122.) |
| 10/01/19 | WSHFC hosts panel entitled, "Refusing the Right of First Refusal," in which counsel for the WSHFC and for developer general partners discuss issues addressed in the Report.  WSHFC moderates the panel, but does not invite any investor representatives to participate.  (*Id.* ¶¶ 138.) |
| 10/15/19 | WSHFC publicly posts the Transfer Rule on its website for the first time following inquiry from Plaintiffs' counsel.  (*Id.* ¶ 118.) |
| 08/28/20 | Judge Raymond Dearie of the United States District Court for the in the Eastern District of New York rules that a ROFR permitted under Section 42(i)(7) is subject to the same requirements as a ROFR under common law, and is not a unilateral option exercisable at the holder's discretion.  (*Id.* ¶ 79.) |
| 09/04/20 | WSHFC proposes modifications to the Transfer Rule that would empower it to prohibit transfers to investors who do not clearly demonstrate to the Commission's satisfaction "that each instance of litigation was no fault of the [investor] and that the [investor] has consistently acted in furtherance of the Low Income Tax Credit Program's goals, including the preservation of projects at low-income housing for the longest periods and, to the extent applicable, the continuing material participation of nonprofit housing organizations."  (*Id.* ¶ 142-44.) |