After recording Return To:
Washington State Housing Finance Commission
Low-Income Housing Tax Credit Division
1000 Second Avenue, Suite 2700
Seattle, Washington  98104-1046
Attn:  Yasna Osses

2009071300081          61   PGS
07/13/2009 10:04am $102.00
SNOHOMISH COUNTY, WASHINGTON

*Misc 5007.*
*Fidelity National Title*
*Major Accounts*
*61/103*

*09 JUL 28 AM 11:16*
*RECEIVED WSHFC*

Document Title:          **Regulatory Agreement (Extended Use Agreement)**

Grantor(s):          **APD WA RD 2007, LP**

Grantee:          **Washington State Housing Finance Commission**

Legal Description (abbreviated form):  PTN OF SE ¼ OF SE ¼, SECTION 19,

TOWNSHIP 32N, RANGE 4E

Additional legal description in Exhibit "A" of document.

Assessor's Property Tax Parcel Account Number(s):  320419-004-036-00, 320419-004-106-00,

Reference numbers of related documents:  1)N/A

**REGULATORY AGREEMENT**
**(EXTENDED USE AGREEMENT)**


**Between**


**WASHINGTON STATE HOUSING FINANCE COMMISSION**


**And**


**APD WA RD 2007, LP**


**Dated as of June 5, 2009**


**WASHINGTON STATE HOUSING FINANCE COMMISSION**
**LOW-INCOME HOUSING TAX CREDIT PROGRAM**


**(Bayview Gardens - Lead APD WA RD 2007 Portfolio Project)**
**TC or OID NUMBER (As Applicable) 07-148A**

# TABLE OF CONTENTS

**Page**

SECTION 1.  DEFINITIONS .................................................................................................. 4

SECTION 2.  LIMITATION ON CREDIT ALLOCATION ................................................ 4

SECTION 3.  OWNER'S REPRESENTATIONS AND WARRANTIES ............................ 5

SECTION 4.  OWNER'S COVENANTS ............................................................................... 6

SECTION 5.  COMPLIANCE MONITORING AND REPORTING REQUIREMENTS .... 14

SECTION 6.  OWNER'S DUE DILIGENCE; DISCLAIMER BY COMMISSION ............ 16

SECTION 7.  RECORDATION; PRIORITY ...................................................................... 18

SECTION 8.  DEFAULT; REMEDIES ................................................................................ 18

SECTION 9.  INDEMNIFICATION .................................................................................... 20

SECTION 10.  TERM OF THIS AGREEMENT ................................................................. 22

SECTION 11.  MISCELLANEOUS ..................................................................................... 24

SECTION 12.  TIME OF THE ESSENCE .......................................................................... 25

SECTION 13.  CAPTIONS ................................................................................................... 25

SECTION 14.  EXHIBITS AND SCHEDULES .................................................................. 25

SECTION 15.  GOVERNING LAW; EFFECTIVE DATE .................................................. 26

SECTION 16.  VALID EXISTENCE; AUTHORIZATION; NO CONFLICT WITH OTHER DOCUMENTS .................................................................................................................... 26

EXHIBIT "A"  -  **LEGAL DESCRIPTION**

EXHIBIT "B"  -  **PROJECT DESCRIPTION**

EXHIBIT "C"  -  **DEFINITIONS**

EXHIBIT "D"  -  **REQUIRED ANNUAL RECORDS**

EXHIBIT "E"  -  **REQUIRED ANNUAL CERTIFICATIONS**

EXHIBIT "F"  -  **LEASE RIDER TO BE ATTACHED TO RESIDENT LEASES AND RENTAL AGREEMENTS**

# REGULATORY AGREEMENT
# (EXTENDED USE AGREEMENT)

## Washington State Housing Finance Commission

## Bayview Gardens - Lead APD WA RD 2007 Portfolio Project
## TC or OID Number (As Applicable) 07-148A

THIS REGULATORY AGREEMENT (EXTENDED USE AGREEMENT) ("Agreement"), dated as of **June 5, 2009,** is between the WASHINGTON STATE HOUSING FINANCE COMMISSION, a public body corporate and politic (the "Commission"), and **APD WA RD 2007, LP**, a **Washington Limited Partnership** (the "Owner").

## RECITALS

A.      The Commission is the housing credit agency authorized to allocate the federal low-income housing tax credit (the "Credit") for residential rental property located in Washington, in accordance with Section 42 of the Code; and

B.      The Owner submitted an Application dated **March 3, 2008,** requesting that the Commission issue a Credit Reservation and/or Allocation to the Project; and

C.      The Owner and the Commission entered into a Credit Reservation and Carryover Allocation Contract (RAC), dated N/A, whereby reserved credit for the Commission agreed to issue an Allocation to the Project (as described in Section 1 below, a Credit Reservation and Carryover Allocation Contract (RAC) may not have been entered into for a Qualified Tax-Exempt Bond-Financed Project);

D.      The Owner acquired, and developed or rehabilitated a Residential Rental Property commonly known as **Bayview Gardens - Lead APD WA RD 2007 Portfolio** (the "Project") located on the property or properties legally described in Exhibit "A" (the "Land"); and

E.       As a condition of having an effective Allocation of Credit, the Owner must enter into this Agreement with the Commission.

## AGREEMENT

Based on the foregoing recitals, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Owner hereby agrees to the terms and conditions of this Agreement, and agrees that the Owner, the Project and the Land shall be

subject to the covenants, conditions, restrictions and terms set forth below in this Agreement, which and are expressly intended to touch and concern, run with and bind the Project and the Land, and which shall inure to the benefit of the Commission, its successors and assigns and be binding upon the Owner, and all other Bound Parties.

## SECTION 1. DEFINITIONS

1.1     Capitalized Terms.  For purposes of this Agreement terms shall have the meanings set forth in Exhibit "C".  If a capitalized term is not defined in Exhibit "C" it shall have the meaning set forth in the *Policies* in effect as of the effective date of the Credit Reservation and Carryover Allocation Contract (RAC) for the Project or, if the Project is a Qualified Tax-Exempt Bond-Financed Project with no Credit Reservation and Carryover Allocation Contract (RAC), the *Policies* in effect as of the date the Owner submitted the Application to the Commission.

1.2     Credit Reservation and Carryover Allocation Contract (RAC) and Bond Projects. This Agreement contains references to a Credit Reservation Contract and Carryover Allocation Contract. These agreements may not have been executed in connection with a Qualified Tax-Exempt Bond-Financed Project unless the Project receives an Allocation of Credit subject to Section 42(h)(1) of the Code (i.e., Credit allocated pursuant to the competitive allocation process).  If the Project is a Qualified Tax-Exempt Bond-Financed Project that did not receive a competitive Allocation of Credit, references in this Agreement to the Credit Reservation and Carryover Allocation Contract (RAC) shall be inapplicable and the provisions in this Agreement referencing those contracts shall be read and interpreted in a manner consistent therewith.

## SECTION 2. LIMITATION ON CREDIT ALLOCATION

The actual amount of Credit finally allocated to any Qualified Building in the Project is reflected on an IRS Form 8609 issued with respect to such Building.  Prior to issuing a Form 8609, the Commission has made or will make a determination as to the amount of Credit necessary for the financial feasibility and viability of the Project.  Further, as part of the Commission's Credit determination for a Project, the Commission has reviewed or will review the reasonableness of the development and operating expenses associated with the Project as well as the market need and demand.  The Commission may require that the Owner submit documentation to substantiate that any or all of a Project's costs are reasonable and appropriate.  The Commission reserves the right, in its sole judgment and discretion, to limit or exclude any development or operating expense included in the Total Project Costs or proforma for a project as part of the Commission's financial feasibility review and Credit determination for the Project.  Further, the determination of the amount of Credit finally allocated to a Building is also subject to the Program Limits in the *Policies*.

## SECTION 3.  OWNER'S REPRESENTATIONS AND WARRANTIES

The Owner represents and warrants to the Commission as follows as of the date of this Agreement:

3.1     Noncompliance.  There is no Noncompliance with respect to the Project, nor has any event occurred that, with the passage or time or giving of notice or both, would constitute a Noncompliance.

3.2     Feasibility and Viability.  The amount of the Credit Reservation and/or Allocation is necessary for the financial feasibility and viability of the Project throughout the Credit Period as a Qualified Low-Income Housing Project.

3.3     Notification of First Lien Position.  The Owner has notified in writing all lenders, financing sources and holders of Prior Liens that as a condition of obtaining Credit, this Agreement must be recorded in first position or each lender or holder must subordinate its liens and security interest(s) in the Project to the interests of the Commission under this Agreement in a form acceptable to the Commission.

3.4     No Project Changes.  There have been no changes in the Project which would alter, amend or make untrue any of the representations or agreements made in the other Project Documents, except as set forth in amendments thereto executed by the Commission.

3.5     True and Complete Certification.   Each Certification submitted with the Application and the Credit Reservation   Carryover Allocation Contract, and each representation and warranty made therein, is true, complete and accurate as of the date of this Agreement.

3.6     Fee Limitations.  The Owner has and shall continue to comply with the limits established by the Commission pertaining to the amount of Developer Fee and Consultant Fees as set forth in the *Policies*.  The Owner has made all disclosures required by the Commission with respect to the Owner, each Developer, each General Partner, each party to a Joint Venture, and/or, in the case of a Limited Liability Company, each Managing Member or, if there is no Managing Member, each Company Member and any Company Manager, as the case may be, being a Related Party, having an Identity of Interest, being Affiliated With, or Controlled By or In Control Of other members of the Development Team and Management Team as more fully described in the *Policies*.

3.7     Compliance with *Policies*.  The Owner and/or the Project, as applicable, is in compliance with the Program Limits in the *Policies*.

3.8     Exhibit "B" Project Information.  The Project information included in Exhibit "B" is true and accurate.

## SECTION 4.  OWNER'S COVENANTS

4.1     Qualification for Credit.  The Owner shall ensure that each Building in the Project qualifies for the Credit.

4.2     Compliance with Program Documents and Exhibit "B".  The Owner and each Building in the Project shall comply with all representations and agreements made in the Program Documents with respect to each Building in the Project unless the Owner submits a written request to approve a modification or change and such request is approved in writing by the Commission.  Specifically, but without limitation, the Owner and each Building in Project is subject to and shall comply with the Credit Set-Aside Category, Additional Low-Income Use Period, Project Compliance Period, Minimum Low-Income Housing Set-Aside, Additional Low-Income Housing Commitment (if any), Special-Needs Housing Commitment for Large Households (if any), Special-Needs Housing Commitment for Persons with Disabilities (if any), Special-Needs Housing Commitment for Persons who are Elderly (if any), Special-Needs Housing Commitment for Housing for Homeless (if any), the Farmworker Housing Commitment (if any), and the requirements for preservation of federally assisted low-income housing (if applicable), as set forth in Exhibit "B".  Except as otherwise set forth in this Agreement, the terms and conditions of each of the commitments, restrictions and covenants set forth in Exhibit "B" shall be as set forth in the *Policies* as they exist on the date the Application was filed with the Commission.

4.3     Additional Low-Income Use Period.  The Owner acknowledges that, except as expressly set forth herein, this Agreement shall remain in full force and effect during the Additional Low-Income Use Period.  The Owner waives any right to terminate this Agreement with respect to any Building in the Project for the duration of the Additional Low-Income Housing Use Period as may otherwise be available pursuant to Section 42(h)(6)(E)(i)(II) of the Code.

4.4     Number of Housing Units.  If this Agreement terminates with respect to any Building in accordance with the terms set forth herein, the minimum number of Housing Units in the Project shall be reduced by the number of Housing Units in such Building at the time of such termination.  Notwithstanding the foregoing, all of the provisions of this Agreement shall remain in full force and effect throughout the term of this Agreement with respect to each Building in the Project unless terminated in conformance with this Agreement.

4.5     Credit Set-Aside Commitment.  The Commitment to comply with the requirements of this Agreement and the *Policies* for the selected Credit Set-Aside Category identified in Exhibit "B" is binding upon the Owner and all successors in interest regardless of whether the Project received a Credit Reservation and/or Allocation under the selected Credit Set-

Aside Category or the balance of the Annual Authority remaining after the Credit Set-Asides.

4.6     Rental of Units to Maintain Low-Income Commitment(s).  The Owner shall rent all Housing Units necessary to maintain the Applicable Fraction of Housing Units devoted to low-income housing only to Residents who are Income eligible for the Low-Income Housing Commitment(s) at the time of their initial occupancy of the Housing Unit.  For the Additional Low-Income Housing Commitment, the Owner shall rent all Housing Units necessary to comply with the Additional Low-Income Housing Commitment only to Residents who are Income eligible for the applicable Additional Low-Income Housing Commitment at the time of their initial occupancy of the Housing Unit.  This requirement(s) applies to all Housing Units necessary to comply with the Applicable Fraction and, if applicable, the Additional Low-Income Housing Commitment for the initial occupancy and each subsequent vacancy throughout the duration of the Project Compliance Period.  The Owner must keep the applicable Housing Units within a building vacant until a Resident is selected who is Income eligible for the Low-Income Housing Set-Aside and/or the Additional Low-Income Housing Commitment, as appropriate.

4.7     Multiple Commitments.  If the Project is subject to the Special-Needs Housing Commitment for Elderly persons and the Project is also subject to one or more additional Special-Needs Housing Commitments, the same Housing Units may be used for more than one Special-Needs Housing Commitment, so long as the actual Resident is eligible for more than one.

If one hundred percent (100%) of the Housing Units in the Project are subject to the Special-Needs Housing Commitments, the same Housing Units may be used for more than one Special-Needs Housing Commitment, so long as the actual Resident is eligible for more than one.

If less than seventy five percent (75%) of the Housing Units in the Project are set-aside for Housing for Homeless and the Project is subject to the Special-Needs Housing Commitment for persons with Disabilities and/or for Large Households, the same Housing Units shall not be used for more than one Special-Needs Housing Commitment, regardless of whether a Resident is eligible for more than one.  A minimum of twenty percent (20%) of all Housing Units in the Project must be used for each additional Special-Needs Housing Commitment selected.

4.8     Marketing Units Subject to Certain Commitments.  If the Project is subject to a Special-Needs Housing Commitment or the Farmworker Housing Commitment, when the Project is Placed-In-Service and ready for initial occupancy each Housing Unit subject to such commitment must first be rented to and occupied by a Resident who qualifies for the commitment (for example, in the case of the Farmworker Housing Commitment, by a Farmworker household).  If the Housing Unit is subsequently vacated, the Owner shall

undertake good faith efforts to actively market any vacant Housing Units that are necessary to comply with the Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment to the appropriate group(s) for a minimum of thirty (30) days. The Owner shall not rent any of the Housing Units necessary to comply with the Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment to anyone who is not eligible for the appropriate Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment during this thirty (30) day period. In the event the Owner is unable to secure a Resident who is eligible for the appropriate Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment after thirty (30) days of active marketing, it may rent the Housing Unit to another prospective Resident. The Owner's right to rent a Housing Unit subject to a Special-Needs Housing Commitment or Farmworker Housing Commitment to a nonqualifying resident following the thirty (30) day recruitment period shall be applicable only to Housing Units that were initially occupied by qualifying Residents.

The recruitment provision applies to all Housing Units included in the Special-Needs Housing Commitment(s) and the Farmworker Housing Commitment, including both Low-Income Housing Units and Market Rate Housing Units, if applicable. The minimum thirty (30) day recruitment period begins on the first full day that (1) a Housing Unit is vacant and ready for occupancy, and (2) the Owner actively commences to market the Housing Unit.

If the Owner rents a Housing Unit included in the Special-Needs Housing Commitment(s) to a household who is not eligible for the appropriate Special-Needs Housing Commitment(s) after the thirty (30) day period, when a comparably sized or larger Housing Unit becomes vacant the Owner must again undertake the good faith efforts to actively market such Housing Unit(s) as described above in this Section 4.9 and shall not rent such Housing Unit(s) for a minimum of thirty (30) days to anyone who is not eligible for the appropriate Special-Needs Housing Commitment(s). If the Owner rents a Housing Unit included in the Farmworker Housing Commitment to an ineligible household after the thirty (30) day period, any and all Housing Units that subsequently become vacant, including the Housing Unit rented to the ineligible household, must be rented to a Resident who is eligible for the Farmworker Housing Commitment (subject to the thirty day marketing requirement set forth in the preceding Section).

The thirty (30) day marketing requirements for the Special-Needs Housing Commitment(s) and the Farmworker Housing Commitment set forth in this Section 4.9 apply to all Housing Units (following initial occupancy by a qualified Resident) which are necessary to comply with the Special-Needs Housing Commitment(s) and the Farmworker Housing Commitment throughout the Project Compliance Period.

Notwithstanding anything herein to the contrary, for the Special-Needs Housing Commitment for persons who are Elderly, no Housing Unit may be rented to any person if the result is that

the Project would no longer be an Elderly Housing Project. Also, notwithstanding anything herein to the contrary, for the Special-Needs Housing Commitment for Housing for Homeless, any vacancies in the Commitment must be filled by a Resident who meets the eligibility criteria for that Commitment.

4.9     Selection Criteria for Residents.  When selecting Residents for occupancy in Low-Income Housing Units or Housing Units subject to a Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment, the Owner shall not apply selection criteria to a prospective Resident that are more burdensome than the selection criteria applied to any other Resident or prospective Resident; and the Owner shall take into consideration the rental history of such prospective Resident as evidence of the ability to pay the applicable rent, if: (i) the rental history is of a term of at least one year; and (ii) the history shows that the Resident has paid at least the same percentage of his income for rent during that period as he will be required to pay for the rent of the Housing Unit for which the Resident is applying.

4.10    No Geographic Segregation.  The Low-Income Housing Units and any Housing Units subject to a Special-Needs Housing Commitment(s) shall not be geographically segregated from other Housing Units in the Project.  In addition, the Low-Income Housing Units and Housing Units in a Special-Needs Housing Commitment(s) shall be substantially the same size as other Housing Units with the same number of bedrooms.

4.11    Unit Configuration.  The configuration of Housing Units (e.g. studios, one-bedrooms, two-bedrooms, etc.) used for the Low-Income Housing Units and the Special-Needs Housing Commitments for Elderly persons, persons with Disabilities and Housing for Homeless shall be proportional to the configuration of the Total Housing Units in the Project unless the Owner obtains the prior written approval of the Commission to a different configuration.

4.12    Quality of Unit Construction.  Subject to such exceptions as may be permitted by the *Policies* and the Tax Credit Laws, all Low-Income Housing Units and any Housing Units subject to a Special-Needs Housing Commitment(s) shall be of the same quality construction as all other Housing Units, and shall be equipped and maintained in the same manner as all other Housing Units, with the exception of any additional amenities provided to meet the needs of Resident(s) with Disabilities.

4.13    Notification and Advertising of Unit Availability.  The Owner shall at least annually notify, (1) the relevant public housing authority, (2) at least two community agencies in the area of the Project, and (3) the general public of the availability of Low-Income Housing Units and any Housing Units subject to a Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment.  Where no public housing authority exists, notice shall be given to an agency authorized to act in lieu of a public housing authority, if any.  Notification to the general public shall be by advertisement(s) of

general circulation in the area of the Project and the advertisement(s) shall conform to the Fair Housing Act, as amended, and state and local law.

4.14 <u>Limitation on Up-Front Rental Charges</u>.  The Owner agrees to:

    (i)    limit up-front charges and fees for Residents of all Low-Income Housing Units and all Housing Units subject to a Special-Needs Housing Commitment(s) to:

        (a) the first month's Gross Rent;

        (b) a reasonable damage or security deposit  no greater than the maximum applicable monthly Gross Rent, plus any reasonable pet deposit and;

        (c) a reasonable credit check fee; and

    (ii)    not charge any other up-front charges or fees, for example, the last month's rent (except as noted below), application fees, and cleaning deposits or fees.

If the household is unable to pay the maximum applicable monthly Gross Rent, the property shall charge no more than 50% up-front and then provide a payment plan for the remaining amount over at least a five-month period.

In addition to the above charges and fees, the Owner may collect the last month's Gross Rent in advance only if the payment thereof is made on at least a six (6) month prorated basis beginning on the second month or later (e.g. one-sixth of the last month's Gross Rent due each month from the second month through the seventh month).

4.15 <u>Compliance with Laws</u>.  The Owner shall at all times comply with all other federal, state and local laws, rules and regulations now or hereafter applicable to the Owner, the Project or any Building, including but not limited to: (i) Tax Credit Laws, (ii) federal housing policy governing nondiscrimination and accessibility, as determined under the Americans with Disabilities Act, the Fair Housing Act, as amended; Architectural Barriers Act of 1968; Housing and Community Development Act of 1974; Civil Rights Act of 1964; Civil Rights Act of 1968; Age Discrimination Act of 1975; (iii) to the extent applicable, the Housing and Urban Development Act of 1968; the Uniform Relocation and Real Property Acquisition Act of 1970; and the Stewart B. McKinney Homeless Assistance Act; and (iv) the State Environmental Policy Act; State Workers Compensation Industrial Insurance Act; Washington Fair Housing Laws; and the Washington State Landlord/Tenant Act; (v) if the Project includes "Federally Assisted Housing" as defined in RCW 59.28.020 (as it may be subsequently amended or renumbered), the written notice requirements specified in RCW 59.28.020 at least twelve (12) months prior to the expiration of the federal rental assistance contract or prepayment of the federal mortgage

or loan; and (vi) all state and local health, safety and building codes and standards. All Units shall at all times be suitable for occupancy and habitable.

4.16    Compliance with Environmental Laws.  In the case of a Project which would be considered to be a Federal Action, Federally Subsidized, financed with Federal Funding or require federal approval or a permit, as those terms are defined and interpreted under federal environmental laws, including but not limited to: the National Environmental Policy Act of 1969; the Clean Water Act; the Clean Air Act; the National Historic Preservation Act; the Lead Based Paint Poisoning Prevention Act; and/or the Flood Disaster Protection Act of 1973, the Owner shall at all times comply with any and all applicable federal environmental laws.

4.17    Compliance with Labor Laws.  In the case of a Project which receives Federal Funding, the Owner shall at all times comply with any and all applicable federal labor laws, including but not limited to: the Davis Bacon Act; Copeland Anti-Kickback Act; Contract Work Hours and Safety Standards; Hatch Act; and the Conflict of Interest Provisions set forth in 24 CFR 570.611.

4.18    Notification of Adverse Events.  The Owner agrees to notify the Commission in writing within five (5) business days of first acquiring knowledge of any of the following:

(1)    A default, that is not timely cured, in payment of any indebtedness incurred in connection with the development of any multifamily housing project or any other real estate development by a Covered Party or any declared default by a Covered Party of any loan incurred in connection with the development of any multifamily housing project, or a default or an alleged default by a Covered Party on any other financial obligation with an outstanding balance which exceeds $100,000.00;

(2)    A material default, or alleged material default, that is not timely cured, by a Covered Party of the Tax Credit Laws or any other applicable laws, rules or regulations regarding any low-income housing tax credit project in Washington or any other jurisdiction;

(3)    The application for or consent to an appointment of a receiver or trustee, (a) for a Covered Party or, (b) over any portion of the property of a Covered Party; an assignment by a Covered Party for the benefit of creditors; the seizure of any part of the assets of a Covered Party by a judgment creditor; an admission in writing by a Covered Party of its inability to pay its debts as they become due; the insolvency of a Covered Party; or a petition being filed by any Covered Party pursuant to any of the provisions of the United States Bankruptcy Code, as amended;

(4)    A petition being filed against any Covered Party pursuant to any of the provisions of the United States Bankruptcy Code, as amended, or an attachment or

sequestration of any property of any Covered Party where the same is not discharged or bonded within ninety (90) days (items (3) and (4) collectively being referred to as the "Bankruptcy" of a Covered Party);

(5)     That a representation or disclosure made to the Commission or to any other low-income housing tax credit allocating agency by any Covered Party is materially false or misleading on the date when such representation or disclosure was made, whether or not that representation or disclosure appears in this Agreement, or that a Covered Party failed to provide any information that makes any such representation or disclosure materially false or misleading;

(6)     The filing of an action, in which a Covered Party is a defendant, to foreclose upon a real estate lien (or retake possession under a ground lease) or the transfer by a Covered Party of an interest in real estate by a deed in lieu of foreclosure or similar instrument;

(7)     A material adverse change in the condition (financial or otherwise), operations, business, or properties of any Covered Party or the Project;

(8)     A pending or threatened lawsuit or claim against a Covered Party which could have a material adverse impact, financial or otherwise, on the operations, business or properties of a Covered Party or the Project; or

(9)     The filing of legal action against, commencement of an examination by, or a formal investigation by any governmental authority for fraud, theft, misappropriation of funds, false certifications, financial improprieties, or similar wrongdoing, including but not limited to an action alleging securities fraud in connection with a low-income housing tax credit program or an action, examination or investigation in which the government authority is seeking or may seek criminal penalties.

4.19    <u>Government Approvals and Permits</u>.  The Owner shall obtain and maintain all necessary state and local licenses, approvals and permits required for the Project or any Building and develop and operate the Project.

4.20    <u>Nondiscrimination</u>.  The Owner shall not discriminate in making available Housing Units in the Project for occupancy on the basis of race, creed, color, sex, national origin, religion, familial status, age or disability; provided that the Owner may take such actions as may be necessary to qualify for or to maintain its qualification for the exemption that relates to housing for older persons under the Fair Housing Act, as amended, and 24 CFR Part 100, Subpart E.  The Owner shall not discriminate against any Resident or prospective Resident based on his or her sources of income, including but not limited to Section 8 or other public assistance, provided such sources of income are not in contravention of any federal, state or local law; specifically, and without limitation, the Owner shall not refuse

to rent a Low-Income Unit to a holder of a voucher or certificate of eligibility under Section 8 of the United States Housing Act of 1937 (because of the status of the prospective tenant as such a holder).

4.21    Tenant Lease Rider.  The Owner shall include a rider (the "Lease Rider") in each Resident lease or rental agreement and provide a copy to such Resident in substantially the form set forth in Exhibit "F."  Each Resident must receive a copy of the Lease Rider prior to his or her execution of a lease or rental agreement.  The Lease Rider must be signed and dated by a Resident signifying receipt of such Lease Rider and a copy of the signed Lease Rider and the lease or rental agreement to which it is attached must be provided to the Resident promptly following execution thereof.  The Owner shall provide the Commission with the master form of lease or rental agreement (together with amendments thereto), and shall maintain all executed leases and rental agreements, with the attached Lease Riders on file for inspection by the Commission.

4.22    Restrictions During Three-Year Period.  Throughout the Three-Year Period applicable to a Building, the Owner shall comply with the terms, conditions, obligations, restrictions, prohibitions, covenants, representations and warranties set forth in this Agreement, the Credit Reservation and Carryover Allocation Contract (RAC), and the Tax Credit Laws, including but not limited to Section 42(h)(6)(E)(ii).  The Owner acknowledges that the Commission's requirements with respect to the Three-Year Period are more stringent than those under Section 42 of the Code.

4.23    Investor and Lender Notice.  The Owner, its designee, representative or agent and/or any syndicator or broker has included and shall include the "Investor and Lender Notice" in any loan application, syndication agreement, offering circular, prospectus, or other information provided to potential lenders or investors in the form set forth in the Policies and Credit Reservation and Carryover Allocation Contract (RAC), and shall provide the Commission with evidence reasonably satisfactory to the Commission of such compliance.

4.24    No Eviction/Nonrenewal Other than for "Good Cause"; Tenant's Right to Enforce Good Cause and Other Commitments.  During the Compliance Period and Extended Use Period, (i) no tenant of a Low-Income Housing Unit may be evicted, and (ii) the owner may not refuse to renew a rental agreement, other than for Good Cause and each rental agreement shall so provide.  Further, in addition to any other rights and remedies provided hereunder, any individual who meets the income limitation for a Low-Income Unit (whether a prospective, present or former occupant of the Building) shall have the right to enforce in any State court the requirements of this Section 4.24 and the commitments, restrictions and covenants set forth in Section 4.2 and Exhibit B hereof.

4.25    Eventual Tenant Ownership Commitment.  If applicable, at the end of the initial 15-year Compliance Period, the Owner shall transfer ownership of 100 percent of the units

in the Project to tenant ownership. The transfer shall be in accordance with Section 42(i)(7) of the Code and the Owner's transfer plan in the form accepted by the Commission (the "Transfer Plan"), which Transfer Plan is incorporated herein by reference. The purchase price for each unit at time of sale shall be affordable to households with incomes meeting tax credit eligibility requirements. To be eligible, the buyer must have had a low income housing tax credit qualifying income at the time of initial occupancy or time of purchase.

The Commission agrees to take all necessary actions, at Owner's expense, to provide for the partial or full release of this Agreement and the acquisition of unit(s) by eligible tenants.

The Owner shall provide the Commission not less frequently than once every five years, commencing on the fifth anniversary of the date of this Agreement, and upon written request from the Commission, a report describing its progress towards compliance with the Transfer Plan, including, but not limited to, an accounting of balances in any tenant homeownership reserve accounts, number of homeownership counseling sessions held with tenants and number of budget and financial training sessions held.

The Owner agrees that, if it is unable to sell the unit(s) to eligible tenant(s) for any reason at the end of the Project Compliance Period: (a) this Agreement shall remain in full force and effect during the Additional Low-Income Use Period and (b) it shall waive its rights under Section 42(h)(6)(E)(i)(II) and 42(h)(6)(F) to terminate this Agreement if the Commission does not present a Qualified Contract in accordance with Section 10.2 hereof.

4.26    Data Collection.  To the extent required of the Commission by federal law, the Owner shall assist the Commission with meeting federal reporting requirements by collecting and submitting information to the Commission annually concerning the race, ethnicity, family composition, age, income, use of rental assistance under section 8(o) of the United States Housing Act of 1937 or other similar assistance, disability status, and monthly rental payments of all low-income households.

## SECTION 5. COMPLIANCE MONITORING AND REPORTING REQUIREMENTS

The Owner shall comply with the compliance monitoring, record keeping, certification, reporting and other requirements described in this Section 5, the Qualified Allocation Plan, WAC 262-01-130(16), the *Policies*, the *Low-Income Housing Tax Credit Compliance Manual*, and the Tax Credit Laws, as the same may be amended. Without limiting the generality of the foregoing, the Owner shall:

5.1    Compliance Monitoring Fee.  Pay to the Commission a nonrefundable Annual Compliance Monitoring Fee described in the latest revision of the *Policies*. The Commission shall have the right to increase the Annual Compliance Monitoring Fee and

the Owner agrees to pay the increased Annual Compliance Monitoring Fee throughout the remainder of the Project Compliance Period.

For Qualified Tax-Exempt Bond-Financed Projects in which the bonds are not issued by the Commission, the Owner shall pay the Annual Compliance Monitoring Fee annually throughout the Project Compliance Period in the amount described above.

Any amounts not paid to the Commission in accordance with this Agreement shall bear interest at the rate of 1.5% per month accruing from the due date until paid.

5.2     _Provide Requested Information._     Timely provide all information and documentation reasonably requested by the Commission, its representatives or designees throughout the Project Compliance Period, including, without limitation, all Certifications or other documentation as to the compliance of each Building in the Project with the terms of this Agreement, the Qualified Allocation Plan, WAC 262-01-130(16), the _Policies_, the _Low-Income Housing Tax Credit Compliance Manual_, Tax Credit Laws, and other requirements of the Commission, IRS, state, federal or local authorities.

5.3     _Access to Project._   Throughout the term of this Agreement, grant the Commission and its representatives access to the Project and to each Building and structure for on-site review and inspection, including but not limited to, such review and inspection as may be required by the Tax Credit Laws and the Qualified Allocation Plan.   The rights of the Commission hereunder shall include, without limitation, the right to interview Residents of the Project, to inspect Housing Units, to review Resident applications and financial information in the possession of the Owner (or its agents), and to review information, including without limitation the Owner's books and records relating to the Project, upon a minimum of three (3) days advance notice.

5.4     _Workshop Attendance._     Attend, together with its property management representative, a tax credit compliance training workshop given by the Commission or its authorized designee prior to commencement of initial rent-up activities for the Project.

5.5     _Copies of IRS Filings._   Provide to the Commission, true, complete, and fully executed copies of: (i) IRS Form 8609 and attached Schedule A (together with any other attachments) for each Building for the first Year of the Credit Period and for each Year of the Credit Period thereafter; (ii) IRS Form 8586 (together with all attachments) for each Building for the first Year of the Credit Period and for each Year of the Credit Period thereafter; and (iii) each and every other form or document that is required, pursuant to Tax Credit Laws, to be filed by the Owner with the IRS in connection with the Project or any Building in the Project throughout the Project Compliance Period.   The copies described above must be filed with the Commission no later than the earlier of the date they are actually filed with the IRS or the date they are legally due to be filed, including extensions, with the IRS.

5.6     Copies of IRS Notices.  Throughout the Project Compliance Period, provide to the Commission true and complete copies of any and all notices, correspondence or other documents received by the Owner or its agent from the IRS with regard to the Project, including but not limited to notices, correspondence or other documents responding to or relating to IRS Form 8609, IRS Form 8586 and IRS Form 8823.  The copies described in the immediately preceding sentence must be filed with the Commission no later than fifteen (15) days after being received by the Owner.

5.7     Maintenance and Retention of Records; Health, Safety and Building Code Violations.  Keep records for the Project (and, as noted, for each Building) that show for each Year throughout the term of this Agreement the information specified on Exhibit "D." The Owner shall retain the records described in Exhibit "D": (i) for at least six (6) years after the due date (with extensions) for filing the federal income tax return for that year; and, (ii) with respect to any year for which an income tax return is not filed or does not reflect the Credit for the Project, for at least six (6) years after the end of that year; provided, however, that the records for the first year of the Credit Period as defined under Section 42(f)(1) of the Code must be retained for at least six (6) years beyond the due date (with extensions) for filing the federal income tax return for the last year of the Compliance Period as defined under Section 42(i)(1) of the Code with respect to a Building in the Project.  In addition, the Owner shall retain, for the duration of this Agreement, the original health, safety, or building code violation reports or notices that are issued with respect to the Project by any state or local government unit.

5.8     Required Certification.   Throughout the Compliance Period, submit at least annually to the Commission a Certification as to the matters described in Exhibit "E."

## SECTION 6.  OWNER'S DUE DILIGENCE; DISCLAIMER BY COMMISSION

6.1     Owner's Due Diligence.  The Owner acknowledges that it fully understands, and has conducted its own due diligence with respect to, the risks and issues of developing and operating a Project which will most likely constitute a tax shelter, and the terms, conditions and obligations of participating in the Tax Credit Program.   The Owner further acknowledges that it has consulted with, and is relying solely upon, its own legal counsel, tax advisors and professionals with respect to this Agreement, the Owner's federal income tax situation, the Owner's participation in the Tax Credit Program, the qualification of the Project or any Building for Credit, the allocation, use and benefits of the Credit, and the commercial feasibility and viability of any Building in the Project.   The Owner acknowledges that the Commission has made and makes no representations or warranties whatsoever with regard to any of such matters.

6.2     Responsibility for Credit Loss.  The Owner acknowledges and agrees that it is solely responsible for all loss and recapture of Credit with respect to any Building, which loss and recapture shall be determined under Tax Credit Laws as they apply to any

Building, the Owner, or any taxpayer, whether due to reduction in the amount of Credit allocated to any Building, noncomplying use of any Building, transfer of the Project or any Building, or termination of any Project Documents.

6.3     Monitoring for Noncompliance.  The Commission has adopted procedures set forth in the Qualified Allocation Plan, the *Policies* and the Low-Income Housing Tax Credit Compliance Manual that it or its designee will follow in monitoring for Noncompliance with provisions of the Tax Credit Laws and the Tax Credit Program and in notifying the IRS of such Noncompliance.  Such procedures and provisions of the Tax Credit Laws are expressly incorporated herein and shall be binding upon the Owner. The Commission may also make other determinations with respect to Credit, the Project, a Building or the Owner from time to time.  Neither the above-described compliance monitoring procedures nor any such determination made by the Commission shall be construed as a representation or warranty by the Commission, nor shall the Commission have liability.

6.4     Conflicting Terms.  The Owner acknowledges that it and the Project are subject not only to the Program Documents but also to the *Policies*, the Low-Income Housing Tax Credit Compliance Manual and the Tax Credit Laws.  The Owner understands that any particular provision thereof may impose upon the Owner a more restrictive or otherwise more onerous definition, term or condition than is set forth in the other Program Documents, the *Policies*, the Low-Income Housing Tax Credit Compliance Manual or the Tax Credit Laws and the Owner agrees that it shall be bound by and shall comply with the more restrictive or more onerous definition, term or condition as determined by the Commission.  The Owner further understands that the *Policies* and the Low-Income Housing Tax Credit Compliance Manual are subject to revision as a consequence of developments in Tax Credit Laws or other applicable laws, and that it is the Owner's obligation to stay informed of, and comply with, all such revisions to the *Policies*.

6.5     Release.  The Owner agrees that the Commission and the other Indemnified Parties shall have no liability to the Owner or any other Indemnitor with respect to the Tax Credit Program, or any act, omission or determination by the Commission or any other Indemnified Parties in connection therewith, including without limitation, the Commission's Allocation of the Credit to the Project, the Commission's apportionment of Credit to any Building, the Commission's compliance monitoring, or any Credit loss or recapture.

6.6     No Duty to Tenant.  This Agreement is not intended, and shall not be construed, to create a duty or obligation of the Commission to enforce any term or provision of this Agreement or any other Program Document on behalf of, at the request of, or for the benefit of any former, present or prospective Resident.  The Commission shall have no direct or indirect obligation to any former, present or prospective Resident for violations by the Owner or any other party of the Agreement, the other Program Documents, Tax Credit Laws, or other applicable laws.

6.7     No Obligation.  Except as set forth in Section 10.2, nothing in this Agreement shall impose any duty or obligation on the Commission to take any action, including without limitation any duty or obligation to find a purchaser for any Building, the Project or any portion thereof or to bring any action enforcing this Agreement.  The Commission may exercise its rights under this Agreement in its sole and absolute discretion.

## SECTION 7.  RECORDATION; PRIORITY

7.1     Recording.  This Agreement shall be recorded by the Owner in the office of the county auditor or recorder of each county in which a Building in the Project is located. The Owner shall deliver evidence of each such recording to the Commission within fourteen (14) days following the execution of this Agreement.

7.2     Subordination.  If any lien (including any mortgage, deed of trust, construction lien or judgment lien) or other monetary encumbrance now or hereafter exists on the Project that, if foreclosed or enforced, would, in the Commission's opinion, terminate, eliminate, or impair this Agreement (collectively, "Prior Liens"), such Prior Liens must be subordinated to this Agreement pursuant to a recorded subordination agreement in form and substance satisfactory to the Commission, and no final Allocation will be made to any Project or Building unless all Prior Liens are so subordinated.  If the Owner is leasing the Land, then for the purposes of this Agreement the owner/lessor of the Land shall be treated as a holder of a Prior Lien.

7.3     Notice of Agreement.  Each and every contract, deed, lease (other than leases and rental agreements between the Owner and Residents) or other instrument hereafter executed that encumbers or conveys the Project or any portion thereof or interest therein shall contain an express provision making such encumbrance or conveyance subject to the terms, conditions and obligations of this Agreement; provided, however, that the failure to comply with this provision shall not impair or affect the priority of this Agreement.

## SECTION 8.  DEFAULT; REMEDIES

8.1     Noncompliance, Notice and Correction Period.  Except as otherwise provided in Section 8.3, the Owner shall notify the Commission within five (5) days after the Owner learns of any Noncompliance or has reason to believe any Noncompliance has occurred or is likely to occur.  The Owner shall correct any Noncompliance, to the extent the Noncompliance is curable, within thirty (30) days after the date the Commission gives the Owner written notice of such Noncompliance (or, if earlier, within thirty (30) days after Owner learns of the Noncompliance); provided, however, the Commission may, in its sole discretion, extend the thirty (30) day correction period for up to six (6) months, but only if the Commission determines there is good cause for granting the extension; and provided further, however, in the event of a foreclosure, deed in lieu of foreclosure, or similar event with respect to the Project or the Land, the correction period for the successor for an existing event of Noncompliance shall be no less than thirty (30) days from the earlier of

the date the successor obtains control or becomes the owner of the Project.  To the extent that the Noncompliance is not corrected within the above-described period including extensions, if any, granted by the Commission, an event of default shall be deemed to occur and the Commission may exercise its rights and remedies under Section 8. Regardless of whether the Noncompliance is cured as set forth above, the Commission will report to the IRS events of Noncompliance as required by the Tax Credit Program and Tax Credit Laws, which shall be without prejudice to any of the Commission's rights and remedies under Section 8 and the Tax Credit Program.  Further, for the purposes hereof, Noncompliance in the form of a representation, warranty or certification that was untrue in any material respect when made, shall, constitute an act of Noncompliance that is not curable.

8.2     <u>Rights and Remedies</u>.  If the Owner fails to cure any Noncompliance within the period set forth under Section 8.1, or if the Noncompliance is of a type not subject to cure, then an event of default shall be deemed to have occurred hereunder and under the other Program Documents and the following provisions shall apply:

8.2.1   The Commission shall be entitled to compel specific performance by the Owner of its obligations under this Agreement and/or to exercise any other rights or remedies it may have, at law or in equity, under this Agreement, the other Program Documents, the *Policies*, the Tax Credit Program or Tax Credit Laws or other applicable law, including recover monetary damages.

8.2.2   Subject to the provisions of Section 6.6, any individual who meets the income limitation for a Low-Income Housing Unit or a Housing Unit in the Additional Low-Income Housing Commitment, or who meets the requirements for occupying a Housing Unit subject to a Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment (such individual may be a former, present or prospective Resident of the Project), may institute and prosecute any proceeding at law or in equity to abate, prevent or enjoin such Noncompliance or breach, or to recover monetary damages caused thereby.

8.2.3   With respect to any Noncompliance involving the occupation of Housing Units by persons who are determined not to meet the income limitations applicable to such Low-Income Housing Units or who, subject to the terms of Section 4.9, are determined not to meet the requirements for occupying a Housing Unit which is subject to the Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment ("Occupancy Noncompliance"), upon demand by the Commission, the Owner shall pay to the Commission an amount equal to all monies received by the Owner with respect to Low-Income Housing Units and, to the extent applicable, Housing Units subject to a Special-Needs Housing Commitment(s) or the Farmworker Housing Commitment, from the time that the Owner or its agents knowingly or negligently permitted the Occupancy Noncompliance to occur with

respect to such Housing Units Section until the Occupancy Noncompliance is cured. Notwithstanding the foregoing, the provisions of this Section 8.2.3 are not intended, and shall not be construed, to grant to the Commission a current lien on or a security interest in, the rents, issues and profits from the Project.

8.2.4   Subject to the provisions of Section 6.6, any individual who meets the income limitation for a Low-Income Housing Unit or a Housing Unit in the Additional Low-Income Housing Commitment (such individual may be a former or present Resident of the Project) shall be entitled to cause the Owner to pay such individual an amount equal to the difference between the monies received by the Owner from such individual with respect to a Low-Income Housing Unit and the amount which should have been received by the Owner if the rent collected by the Owner for such Unit was in compliance with the provisions of this Agreement.

8.3   <u>Breach of Section 4.18</u>.   The failure of the Owner to give timely notice to the Commission as required by Section 4.18 and the Bankruptcy of the Owner shall each constitute an event of default for the purpose of Section 8.2 and provisions of Section 8.1 above allowing the Owner a period to correct Noncompliance shall not apply in those instances. Further, the mere occurrence (even with timely notice) of any of the other events described in items (1) through (9) of Section 4.18 also may constitute an event of default for the purposes of Section 8.2. Specifically, upon the occurrence of an event described in Section 4.18, the Commission shall have the right to demand that the Owner provide to the Commission adequate assurance that (i) the development and operation of the Project will not be materially impaired or potentially harmed and (ii) the Owner is and will be able to fully perform without default all of its obligations under the Program Documents. If the Owner fails to provide such adequate assurance within ten (10) days from the date that the demand for written assurance is given by the Commission, the Commission may, without further notice or opportunity to cure, declare an event of default and exercise its rights and remedies under Section 8.2.

8.4   <u>Debarment</u>.   The Owner understands and acknowledges that under certain circumstances the Owner (and other parties related to the Project) may be barred from participating in the Commission's Tax Credit Program, which shall be without prejudice to any of the Commission's rights and remedies under Section 8 and the Tax Credit Program. The debarment rules and procedures are currently set forth in WAC 262-03-040.

## SECTION 9. INDEMNIFICATION

9.1   <u>Indemnity and Hold Harmless</u>.   The Owner, each General Partner, each party to a Joint Venture, and, in the case of a Limited Liability Company, each Managing Member or, if there is no Managing Member, each Company Member and any Company Manager (the "Indemnitors"), as applicable, shall jointly and severally at all times defend (with counsel reasonably acceptable to the Commission) indemnify and hold harmless and

release the Commission, its successors and assigns, including their respective members, officers, employees, agents and attorneys (the "Indemnified Parties"), from and against any and all claims, suits, losses, damages, costs, expenses and liabilities of whatsoever nature or kind (including but not limited to attorneys' fees, litigation and court costs, amounts paid in settlement, amounts paid to discharge judgment(s), and any disallowance of tax benefits) directly or indirectly resulting from, arising out of, or related to: (i) the financing, acquisition, construction and/or rehabilitation, syndication, sale, management or operation of the Project; (ii) any Noncompliance or failure to perform any covenant under this Agreement or any other Program Document (whether or not cured); (iii) any breach of a representation, warranty or covenant in Sections 3 or 4 or in any other Program Document; (iv) any other act or omission (whether or not cured) constituting a default under Section 8; or (v) the enforcement by the Commission, its successors and assigns of the Commission's rights and remedies under this Agreement or any other Program Document.

9.2     Survival.  The obligations of the Indemnitors under this Section 9 shall survive any transfer of the Project (whether voluntarily or involuntarily) or termination of this Agreement and any attempted transfer or assignment or termination of any Indemnitor's interest in Owner or the Project; provided, however, the indemnification obligations of an Indemnitor shall not apply with respect to matters first arising after such Indemnitor has disposed of Indemnitor's interest in the Project or the Owner, as applicable, in accordance with the provisions of this Agreement.

9.3     Limited Liability for Subsequent Owner.  Except for accrued Annual Compliance Monitoring Fees, no successor in interest to the Owner ("Successor Indemnitor") shall be liable under this Section 9 for: (i) acts or omissions of persons or entities other than the Successor Indemnitor that occurred before the earlier of the date the Successor Indemnitor obtained control or became the owner of the Project; or (ii) events or conditions on or related to the Project or any Building, or defaults under this Agreement or any other Program Document, occurring or existing prior to the earlier of the date such Successor Indemnitor obtained control or became the owner of the Project.  Notwithstanding the foregoing, if a Noncompliance or other default exists under this Agreement or any other Program Document that arose before and is continuing after such Successor Indemnitor either obtains control or becomes the owner of the Project (each a "Continuing Default"), then such Continuing Default shall exist under this Agreement and Owner shall be under default under Section 8 only to the extent that the Continuing Default relates to the period commencing on the date the successor Owner obtained control or became the owner of the Project, in which case, the successor shall have the cure rights, if any, set forth in Section 8.  If and so long as the cure of a Continuing Default is prohibited by law (including restrictions on tenant evictions), the successor shall not be in default and shall not be required to cure the Continuing Defaults, but the Commission will nevertheless give the Successor Indemnitor written notice of a Continuing Default and/or report the same to the IRS as provided in Section 8.1.

## SECTION 10.  TERM OF THIS AGREEMENT

10.1    Term.  This Agreement shall be effective with respect to the Project and the Land upon execution of this Agreement and continue in full force and effect throughout the Project Compliance Period, unless sooner terminated with respect to a Building under Sections 10.2 and 10.3 below; provided, however, that the Indemnitor's obligations under Section 9 shall survive expiration or termination of this Agreement.

10.2    Purchase Request.  This Agreement may be terminated with respect to a Building in the Project under the following conditions:

10.2.1  Purchase Request.  At any time after the close of the latest to end of: (i) the fourteenth (14th) year of the Compliance Period with respect to a Building; or (ii) one Year prior to the end of the Additional Low-Income Housing Use Period with respect to such Building, if any, the Owner may submit to the Commission a written request ("Purchase Request") that the Commission find a person to purchase the Owner's interest in such Building.

10.2.2  Time Period.  The Commission shall have one year from its receipt of a Purchase Request to present a proposed Qualified Contract by a person who agrees to purchase such Building and continue to operate the low-income housing portion of such Building as a qualified low-income building (within the meaning of Section 42 of the Code).

10.2.3  Qualified Contract.   If the Commission presents a timely proposed Qualified Contract under Section 10.2.2, the Purchase Request shall become irrevocable and the purchase and sale of the Building shall be carried out pursuant to the terms of the Qualified Contract. If, during the one year period and before the Commission presents a Qualified Contract, the Owner withdraws the Purchase Request: (i) the Owner shall fully reimburse the Commission for its costs incurred in attempting to locate a purchaser, including but not limited to the Commission's advertising costs, broker fees and attorneys' fees; and (ii) this Agreement shall not terminate with respect to such Building.  However, the Owner shall not be precluded from having Section 10.2 apply to a subsequent request made thereunder with respect to such Building.

10.2.4  Failure to Present Qualified Contract.  If the Commission does not present a proposed Qualified Contract for a Building under Section 10.2.2 by the close of the one year period, then the provisions of this Agreement in effect for such Building, excluding Section 9 above, shall terminate at the end of Three-Year Period in effect with respect to such Building and this Agreement, excluding Section 9 above, shall thereafter be applied by excluding such Building from the Project; provided this

Agreement shall continue in full force and effect and shall continue to apply to each Building, the Land, and Project not subject to the Owner's Purchase Request.

10.2.5 <u>Multiple Buildings</u>. If the Project consists of more than one Building, then the terms and requirements for the sale of one or more but not every Building in the Project shall be governed by the Tax Credit Laws and other applicable law. Nothing in this Agreement shall be deemed to permit sale of any Building or any interest in a Building, the Land, the Project or any portion thereof in violation of the Tax Credit Laws or other applicable law, including without limitation state and local subdivision and zoning laws, ordinances and regulations.

10.3   <u>Termination Upon Foreclosure</u>.

10.3.1 <u>Foreclosure</u>. In the event title to a Building is transferred during the term of this Agreement by reason of foreclosure or forfeiture under a deed of trust, mortgage or real estate contract, by deed in lieu of foreclosure or by any other similar process, then this Agreement, excluding Section 9 above, shall automatically terminate with respect to such Building and any portion of Land upon which such Building is located (the Building together with any portion of the Land upon which such Building is located (whether owned or leased) are referred to in this Section 10.3.1 as the "transferred property") at the end of the Three-Year Period applicable to such Building. This Agreement shall thereafter be effective as to the Project but excluding the transferred property. In the event a successor in title by reason of the foreclosure, forfeiture or deed in lieu of foreclosure desires to qualify for Credit for such Building, if any, such successor in interest shall execute a revised regulatory agreement (extended use agreement) with the Commission and shall perform such acts and execute such other and further contracts or agreements required by the Commission; provided, if for any reason a revised regulatory agreement (extended use agreement) is not executed, such successor shall remain subject to, and liable as Owner under, the terms of this Agreement for the Three-Year Period.

10.3.2 <u>Scheme to Terminate</u>. Notwithstanding the foregoing, Section 10.3.1 shall not apply and all provisions of this Agreement shall remain in full force and effect with respect to a transferred property if after an acquisition described in such Section, the Owner or a related party (as defined in Sections 42(d)(2)(D)(iii), 267, 707(b) or 1563(a) of the Code) acquires an ownership interest (for federal income tax purposes) in such transferred property if the Internal Revenue Service or the Commission determines that such acquisition is part of an arrangement with the Owner, a purpose of which is to terminate this Agreement in whole or in part.

10.3.3 <u>Condemnation</u>. In the event of involuntary transfer with respect to a Building arising as a consequence of seizure, requisition or condemnation by a

governmental authority, this Agreement, excluding Section 9 above, shall automatically terminate with respect to such Building and any portion of Land seized, requisitioned or condemned by such governmental authority; and this Agreement shall thereafter be applied by excluding such Building and portion of Land from the Project.

## SECTION 11.  MISCELLANEOUS

11.1    Notices; Counting Days.  All notices to be given pursuant to this Agreement shall be in writing and shall be deemed given three (3) calendar days after the date sent by certified or registered mail, return receipt requested, to the parties at the addresses set forth below, or to such other place as a party may from time to time designate in writing:

| | |
|---|---|
| Owner: | **APD WA RD 2007, LP** |
| Contact for Legal Notices: | **Stephen Whyte**<br>**President**<br>**APD WA RD 2007 Management, LLC**<br>**1700 Seventh Ave, Suite 2075**<br>**Seattle WA  98101** |
| Commission: | Washington State Housing Finance Commission<br>1000 Second Avenue Suite 2700<br>Seattle, Washington 98104-1046 |
| Attn: | Executive Director |

Except as otherwise set forth herein, "days" as used in this Agreement and all Exhibits hereto shall mean calendar days; provided if the last day of a deadline or other period described herein would otherwise fall on a Saturday, Sunday or Washington State holiday, the last day of such deadline or other period shall extend to the next calendar day that is not a Saturday, Sunday or Washington State holiday; provided, further, if the last day of a deadline or other period is December 31 or any other date that cannot be extended under the law, the deadline or other period shall be the last day prior to the original deadline or other period that is not a Saturday, Sunday or Washington State holiday.

11.2    Amendment.  This Agreement may only be amended by a written instrument in recordable form signed by the Commission and the Owner; provided, however, the Owner, all Bound Parties and all Indemnitors acknowledge and agree that certain provisions of the Tax Credit Laws may change or be amended from time to time, and the Commission shall have the right to amend this Agreement, in its sole discretion, to the extent necessary to comply with or be consistent with such changes or amendments.  The Owner and all Indemnitors agree that they shall be subject to and bound by such changes and amendments on a prospective basis, and agree to execute an amendment to this Agreement

within ten (10) days of the Commission's request to reflect the same, but their signatures shall not be required for such amendment to be effective.

11.3    Cumulative Rights; Waiver.  All rights and remedies of the Commission under this Agreement, the other Program Documents, the *Policies*, the Tax Credit Program, the Tax Credit Laws or other applicable laws are cumulative and may be exercised singularly or concurrently, and the exercise or any one or more of such rights or remedies shall not affect or preclude the exercise of any other rights, powers, or remedies which the Commission may have.   Any forbearance, failure, or delay by the Commission in exercising any right, power, or remedy shall not be deemed to be a waiver thereof and any single or partial exercise of any right, power, or remedy shall not preclude the further exercise thereof or the exercise of any other right, power, or remedy.

11.4    Partial Invalidity.   Each and every term of this Agreement shall be valid and enforceable to the fullest extent possible.  If any term or provision of this Agreement or the application thereof to any person, entity or circumstance shall to any extent be invalid or unenforceable, the remainder of this Agreement or the application of such term or provision to persons, entities or circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.

11.5    Further Assurances.  The Owner agrees to execute, acknowledge, and deliver any and all documents, instruments, and writings, and to perform other acts as are reasonably necessary to carry out the purposes of this Agreement and the other Program Documents.

11.6    Project Transfer or Assignment.  Subject only to the specific exceptions set forth in the *Policies*, each and every Project Transfer or Assignment shall require the prior written consent of the Commission.   Specifically, but without limitation, pursuant to Section 42(h)(6)(B)(iii), the Commission shall not consent to any transfer or disposition of any portion of a Building to any person unless all of the Building is transferred to such person, and any such attempted transfer or disposition is hereby prohibited.

## SECTION 12.  TIME OF THE ESSENCE

Time is of the essence of each of Owner's obligations under this Agreement.

## SECTION 13.  CAPTIONS

Captions used in this Agreement are used for convenience of the Parties only and shall not be deemed to limit, modify or alter any of the substantive provisions of this Agreement.

## SECTION 14.  EXHIBITS AND SCHEDULES

All exhibits and schedules to this Agreement are incorporated herein by this reference.

## SECTION 15.  GOVERNING LAW; EFFECTIVE DATE

This Agreement shall be governed by the laws of the state of Washington. Notwithstanding the date of the Agreement set forth on page one, this Agreement is entered into and shall be effective on the last signature date of the parties hereto.

## SECTION 16.  VALID EXISTENCE; AUTHORIZATION; NO CONFLICT WITH OTHER DOCUMENTS

The Owner warrants that it is validly organized and currently authorized to do business in the state of Washington.  The Owner, and each party or person executing this Agreement on behalf of the Owner, represents and warrants as follows:  (i) that the execution, delivery and performance of this Agreement have been duly authorized and approved by the appropriate governing body of the Owner; (ii) that this Agreement, upon execution by each signatory of the Owner as set forth below, constitutes a valid and binding agreement of the Owner; (iii) if the Owner is a Partnership, that the Partners executing this Agreement on behalf of the Owner constitute all of the General Partners of the Partnership as of the date of the execution of this Agreement; (iv) if the Owner is a Joint Venture, that the parties executing this Agreement on behalf of the Owner constitute all of the parties of the Joint Venture; and (v) if the Owner is a Limited Liability Company, that the parties executing this Agreement on behalf of the Owner constitute, (a) if the Limited Liability Company has one or more Managing Members, all Company Managers (including all Managing Members) or (b) if the Limited Liability Company has no Managing Members, all Company Members and all Company Managers, if any, as of the date of the execution of this Agreement.  The Owner further warrants that the Owner has not executed and shall not execute any other agreement with provisions contradictory to, or in opposition to, the provisions hereof, and that in any event this Agreement is controlling as to the rights and obligations in this Agreement and supersedes any other conflicting requirements.

[Be sure to keep all signatures inside the box to be able to record the document.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their respective, duly authorized representatives on the date(s) set forth opposite their signatures below.

**Note:  If the Owner is a Partnership, each General Partner must sign.  If the Owner is a Limited Liability Company that has one or more Managing Members, each Company Manager (including each Managing Member) must sign.  If the Owner is a Limited Liability Company that has no Managing Members, each Company Member and any Company Manager must sign.  If the Owner is a Joint Venture, each party to the Joint Venture must sign.  If the Owner is one or more individuals, each individual must sign.**

OWNER:  **APD WA RD 2007, LP**

By (print):  APD WA RD 2007 Management, LLC  its/a  Co-General Partner
By (sign):  _____
Name (print):  David A. Beacham  Date:  6/30/09
Title (print):  Vice President of the Manager  _____

By (print):  Hearthstone Housing Foundation  its/a  Managing General Partner
By (sign):  _____
Name (print):  Socorro Vasquez  Date:  _____
Title (print):  Executive Director  _____

By (print):  _____  its/a  _____
By (sign):  _____
Name (print):  _____  Date:  _____
Title (print):  _____


Owner's Federal Taxpayer Identification Number: **26-0423897**


WASHINGTON STATE HOUSING FINANCE COMMISSION

By  _____  Date:  _____
       Kim Herman, Executive Director


Revised November 14, 2008                                   REGULATORY AGREEMENT (Extended Use Agreement)
                                                 Bayview Gardens - Lead APD WA RD 2007 Portfolio  (TC or OID # 07-148A)
                                                                        27

*[Notary page for person signing on behalf of an entity.  Please make additional copies of the applicable notary page as needed for each signatory.  Be sure to keep all marks and the notarial stamp/seal inside the box to be able to record the document.]*

STATE OF ~~WASHINGTON~~ California        )

                       ) ss.

COUNTY OF San Diego        )

I certify that I know or have satisfactory evidence that _____ is the person who appeared before me, and said person acknowledged that he/~~she~~ signed this instrument, on oath stated that he/~~she~~ was authorized to execute the instrument as the/a Vice President of the Manager of, APD WA RD 2007 Management, LLC, which is the/a Co-General Partner of APD WA RD 2007, LP, and acknowledged it to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: June 30, 2009

_Melissa Mez_
Notary Public

Name (print): Melissa Mendez

Residing at: Encinitas, CA

Commission expires: 7/2/2012

MELISSA MENDEZ
Commission # 1805530
Notary Public - California
San Diego County
My Comm. Expires Jul 2, 2012

(Use this space for notarial stamp/seal.)

[Be sure to keep all signatures inside the box to be able to record the document.]

IN WITNESS WHEREOF, the parties have caused this Agreement to be signed by their respective, duly authorized representatives on the date(s) set forth opposite their signatures below.

**Note: If the Owner is a Partnership, each General Partner must sign. If the Owner is a Limited Liability Company that has one or more Managing Members, each Company Manager (including each Managing Member) must sign. If the Owner is a Limited Liability Company that has no Managing Members, each Company Member and any Company Manager must sign. If the Owner is a Joint Venture, each party to the Joint Venture must sign. If the Owner is one or more individuals, each individual must sign.**

OWNER: **APD WA RD 2007, LP**

By (print): APD WA RD 2007 Management, LLC  its/a  Co-General Partner
By (sign): _____
Name (print): David A. Beacham  Date: _____
Title (print): Vice President of the Manager _____

By (print): Hearthstone Housing Foundation  its/a  Managing General Partner
By (sign): _____
Name (print): Socorro Vasquez  Date: 6/30/09
Title (print): Executive Director

By (print): _____  its/a _____
By (sign): _____
Name (print): _____  Date: _____
Title (print): _____

Owner's Federal Taxpayer Identification Number: **26-0423897**

WASHINGTON STATE HOUSING FINANCE COMMISSION

By _____  Date: 7/6/09
       Kim Herman, Executive Director

Revised November 14, 2008                    REGULATORY AGREEMENT (Extended Use Agreement)
                                             Bayview Gardens - Lead APD WA RD 2007 Portfolio  (TC or OID # 07-148A)
                                             27

*[Notary page for person signing on behalf of an entity.  Please make additional copies of the applicable notary page as needed for each signatory.  Be sure to keep all marks and the notarial stamp/seal inside the box to be able to record the document.]*

STATE OF WASHINGTON          )
                             ) ss.
COUNTY OF _King_             )

I certify that I know or have satisfactory evidence that _Socorro Vasquez_ is the person who appeared before me, and said person acknowledged that he/she signed this instrument, on oath stated that he/she was authorized to execute the instrument as the/a _Executive Director_ of, _Hearthstone Housing Foundation_, which is the/a _Managing General Partner_ of _APD WA RD 2007, LP_, and acknowledged it to be the free and voluntary act of such party for the uses and purposes mentioned in the instrument.

Dated: _6/30/09_

Notary Public

Name (print): _Vicki L. Miller_

Residing at: _Bremerton, WA_

Commission expires: _11/15/09_

(Use this space for notarial stamp/seal.)

Revised November 14, 2008

REGULATORY AGREEMENT (Extended Use Agreement)
Bayview Gardens - Lead APD WA RD 2007 Portfolio (TC or OID # 07-148A)

*[Notary page for person signing on behalf of Washington State Housing Finance Commission. Be sure to keep all marks and the notarial stamp/seal inside the box to be able to record the document.]*

STATE OF WASHINGTON     )

                              ) ss.

COUNTY OF KING           )

I certify that I know or have satisfactory evidence that <u>Kim Herman</u> is the person who appeared before me, and said person acknowledged that he signed this instrument, on oath stated that he was authorized to execute the instrument as the <u>Executive Director</u> of the <u>Washington State Housing Finance Commission</u>, a body corporate and politic, and acknowledged it to be the his free and voluntary act for the uses and purposes mentioned in the instrument.

Dated: _____7/6/09_____



Notary Public

(Use this space for notarial stamp/seal.)

Name (print): _____Yasna E. Osses_____

Residing at: _____Seattle, Washington_____

Commission expires: _____3/1/2010_____

Revised November 14, 2008

REGULATORY AGREEMENT (Extended Use Agreement)
Bayview Gardens - Lead APD WA RD 2007 Portfolio (TC or OID # 07-148A)